**ASSOCIATED STUDENTS FOR the UNIVERSITY OF CALIFORNIA AT RIVERSIDE, an unincorporated association, et al., Plaintiffs,**

v.

**ATTORNEY GENERAL OF the UNITED STATES et al., Defendants.**

**No. 72-1327-F.**

United States District Court,
C. D. California.

Nov. 28, 1973.

Carlyle W. Hall, Jr., Mary D. Nichols,
John R. Phillips, Brent N. Rushforth,

Fredric P. Sutherland, Center for Law in the Public Interest, Los Angeles, Cal., for plaintiffs.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Donald J. Merriman, Asst. U. S. Attys., Michael Hunter, Atty., Department of Justice, Los Angeles, Cal., for defendants.

Arthur S. Ecker, for Los Angeles Area Council Planned Parenthood World Population, Beverly Hills, Cal., amicus curiae.

## OPINION AND ORDER

Before CARTER, Circuit Judge, and EAST and FERGUSON, District Judges.

FERGUSON, District Judge:

This is an action for declaratory and injunctive relief and relief in the nature of mandamus. The plaintiffs seek to invalidate (a) those portions of 18 U.S.C. § 1461 which provide that information concerning abortion is "nonmailable matter" and make the knowing use of the mails for such matter a crime, and (b) the provisions of § 1461 which, together with 39 U.S.C. § 3001(e), make the mailing of unsolicited advertisements of birth control devices a crime.[1] Plaintiffs contend that, both on their face and as applied to plaintiffs, these portions of 18 U.S.C. § 1461 violate the First Amendment, in that they create an unconstitutional system of prior restraint upon protected speech and are unconstitutionally vague and overbroad. We hold that at least one class of plaintiffs has standing to maintain this action and in part grant the relief requested.

Since the action seeks an "injunction restraining the enforcement, operation or execution of a[n] Act of Congress for repugnance to the Constitution," a three-judge district court was convened under 28 U.S.C. § 2282 to decide this case pursuant to 28 U.S.C. § 2284.

The action was brought by the named individual plaintiffs as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other students at the University of California at Riverside (UCR) who now or in the future may want to send or receive information about birth control or abortion through the United States mails. In a pre-trial conference order, the parties stipulated that (1) the class is so numerous that joinder of all of its members is impractical, (2) common questions of law and fact are presented, (3) the claims of the representative parties are typical of those of the class, (4) the defendants have acted on grounds generally applicable to the class, and (5) the interests of the class are fairly and adequately represented by the named individual plaintiffs.

The stipulation has eliminated any issue with reference to whether the action is properly a class action in accordance with Rule 23 of the Federal Rules of Civil Procedure. Therefore, this opinion shall not have any precedential value with regard to that matter in any possible subsequent proceedings or otherwise.

Plaintiff Associated Students of the University of California at Riverside (ASUCR) is the official student government organization on the Riverside campus of the University of California. ASUCR is funded by student fees and supports projects of interest to students on the Riverside campus.

The named individual plaintiffs are all resident students at UCR. They include the president and vice-president of ASUCR and the editor of the student newspaper at UCR. Federal jurisdiction is invoked upon the grounds that this is an action concerning the postal service, 28 U.S.C. § 1339, and that the action is in the nature of mandamus to compel an

---

1. Plaintiffs do not challenge the provisions of the statute regarding the mailing of unsolicited contraceptive devices themselves, but only those provisions prohibiting the mailing of unsolicited advertisements for such devices. In doing so, they attack the provisions of 39 U.S.C. § 3001(e)(2) as incorporated into 18 U.S.C. § 1461, but do not attack those provisions of Section 1461 which incorporate 39 U.S.C. § 3001(e)(1).

officer of the United States Postal Service to perform a duty owed to the plaintiffs, 28 U.S.C. § 1361. The action seeks a declaration of plaintiffs' rights under 28 U.S.C. §§ 2201 and 2202, an injunction pursuant to 28 U.S.C. § 2282, and relief in the nature of mandamus under 28 U.S.C. § 1361.

The court finds the following facts:

1. In February 1971, plaintiff Tobin purchased 3,000 copies of a 48-page printed pamphlet entitled "Birth Control Handbook" (5th ed. rev. 1969), published by students at McGill University in Montreal. The text covers the anatomy of male and female sexual organs, hormones and the menstrual cycle, the physiology of sexual intercourse, conception, birth control, abortion, and venereal disease, and also contains a bibliography of medical publications. The chapters on birth control discuss in detail the mode of operation, effectiveness, and disadvantages of all medically approved forms of contraception including the "rhythm method" endorsed by the Catholic Church. The chapter on abortion describes and evaluates the safety of various abortion procedures and discusses the legal status of abortions in different states and countries. Information in the Handbook is presented in a straightforward, clinical manner. The purchase price of $120 plus air freight from Montreal to Los Angeles was paid by check from the general fund of plaintiff ASUCR.

2. During the first week of March 1971, approximately 1,850 copies of the Handbook plus a one-page Explanatory Sheet were distributed by hand or via UCR campus mail to women students living in dormitories at UCR. No complaints that this material was offensive or annoying were received. The Explanatory Sheet indicates that the Handbook is being distributed because of frequent requests received by ASUCR for information about abortion and birth control. It describes two family planning clinics in Riverside and states that "The Dalkon shields (intra-uterine device) are available there [at one of the clinics], for women who have not been pregnant." The Sheet refers the reader to ASUCR for additional information about abortion or for any other advice.

3. In mid-March, plaintiffs Tobin and Rabinovitch and several others placed about 1,250 copies of the Handbook and Explanatory Sheet in individual envelopes and addressed them separately to all registered women students living off-campus. The names and addresses of these students were obtained from a computer listing maintained by the University. The students affixed 15 cents postage to each envelope, stamped them "Third Class Mail", and listed the return address of ASUCR.

4. On March 22, 1971, plaintiffs delivered the 1,250 stamped, addressed envelopes containing copies of the Handbook and Explanatory Sheet to the clerk of the United States Post Office in Riverside, California, for mailing.

5. Later that day, the Dean of Students at the University, Mr. Ed Kushner, notified plaintiffs that the Post Office had opened one of the envelopes pursuant to its custom of inspecting to make sure that bulk third-class mailings contain only printed matter. Dean Kushner said he had been informed by the postal officials that the Post Office refused to mail the Handbooks and Explanatory Sheets because they violated a postal regulation prohibiting the mailing of birth control and abortion information. Dean Kushner also told the plaintiffs that he had arranged for the return of their postage as follows: if plaintiffs removed the Handbooks and Explanatory Sheets from the envelopes and returned the canceled envelopes to the Post Office for counting, the Postal Service would shred the envelopes and return the postage. Plaintiffs complied with this plan and postage was returned.

6. On March 25, 1971, defendant Scudder, the Riverside Postmaster, wrote to Dean Kushner citing § 123.723 of the Postal Manual as his authority for refusing to mail the Birth Control Handbook and Explanatory Sheet. That section provided that "[a]ny written or

printed matter giving information as to how to obtain any article or to use any means for preventing conception or producing abortion is unmailable."

7. On September 1, 1971, Carlyle W. Hall, Jr., attorney for plaintiffs, wrote to defendant Scudder, contending that § 123.723 of the Postal Manual conflicted with the 1971 amendments to 18 U.S.C. § 1461, Pub.L. 91–662, 84 Stat. 1973, since the amendments generally deleted references to information concerning "prevention of conception" from the statute, resulting in the postal regulation's being invalid under the amended statute. The letter asserted that the Postmaster's refusal to deliver plaintiffs' Handbooks and Explanatory Sheets was contrary to law and demanded that the materials be accepted for mailing without further delay. Mr. Hall also requested payment for the cost of the shredded envelopes and for the labor required to address, stuff and sort the envelopes.

8. Mr. O. R. Stites, Jr., the Assistant Regional Counsel for the United States Postal Service, responded to Mr. Hall on February 22, 1972. His letter stated that the Handbook and enclosure were still "nonmailable matter" because they contained information regarding the "procuring or producing of abortion" under the fourth paragraph of 18 U.S.C. § 1461. Mr. Stites also asserted that the Explanatory Sheet might constitute "nonmailable matter" under the eighth paragraph of 18 U.S.C. § 1461, which, together with 39 U.S.C. § 3001(e), provides that "[a]ny unsolicited advertisement of matter which is designed, adapted, or intended for preventing conception" is nonmailable matter. He suggested that the statement in the Explanatory Sheet that "The Dalkon shields (intra-uterine device) are available there [at a public hospital], for women who have not been pregnant" could be construed as unsolicited advertising of birth control devices within the prohibition of the statute.

Mr. Stites' letter concluded that any further attempt to mail the Handbooks and Explanatory Sheets would be turned over to the United States Attorney for prosecution under 18 U.S.C. § 1461:

"With respect to your request that the Postmaster now accept the same matter for mailing, we are instructing the Postmaster, by copy of this letter, to submit a sample of any future mailing of this material to the Postal Inspection Service for referral to the Regional Counsel for a decision as to whether the Department of Justice would initiate prosecution under 18 U.S.C. § 1461. During the period of consideration by the U. S. Attorney, the Postmaster is instructed, absent contrary instructions from the Regional Counsel to withhold such matter from the mails. Should the U. S. Attorney decline to prosecute, the Postmaster is instructed to deliver such matter. Should the U. S. Attorney initiate prosecution, the Postmaster is instructed to abide by any instructions of the U. S. Attorney."

9. Plaintiffs continue to want to mail the Handbooks and Explanatory Sheets to female students registered at UCR who live off-campus, and are ready to do so as soon as their legal rights are determined.

18 U.S.C. § 1461 provides:

"§ 1461. Mailing obscene or crime-inciting matter.

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and

"Every article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and

"Every article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose; and

"Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by

what means any of such mentioned matters, articles, or things may be obtained or made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means abortion may be produced, whether sealed or unsealed; and

"Every paper, writing, advertisement, or representation that any article, instrument, substance, drug, medicine, or thing may, or can, be used or applied for producing abortion, or for any indecent or immoral purpose; and

"Every description calculated to induce or incite a person to so use or apply any such article, instrument, substance, drug, medicine, or thing—

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

"Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section or section 3001(e) of title 39 to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

"The term 'indecent', as used in this section includes matter of a character tending to incite arson, murder, or assassination."

39 U.S.C. § 3001(e) provides:

"§ 3001. Nonmailable matter

\* \* \* \* \* \*

"(e)(1) Any matter which is unsolicited by the addressee and which is designed, adapted, or intended for preventing conception (except unsolicited samples thereof mailed to a manufacturer thereof, a dealer therein, a licensed physician or surgeon, or a nurse, pharmacist, druggist, hospital, or clinic) is nonmailable matter, shall not be carried or delivered by mail, and shall be disposed of as the Postal Service directs.

"(2) Any unsolicited advertisement of matter which is designed, adapted, or intended for preventing conception is nonmailable matter, shall not be carried or delivered by mail, and shall be disposed of as the Postal Service directs unless the advertisement—

"(A) is mailed to a manufacturer of such matter, a dealer therein, a licensed physician, or surgeon, or a nurse, pharmacist, druggist, hospital, or clinic; or

"(B) accompanies in the same parcel any unsolicited sample excepted by paragraph (1) of this subsection.

An advertisement shall not be deemed to be unsolicited for the purposes of this paragraph if it is contained in a publication for which the addressee has paid or promised to pay a consideration or which he has otherwise indicated he desires to receive."

Two central issues are presented in plaintiffs' challenge to section 1461: (1) whether the plaintiffs present a justiciable case or controversy and have standing to maintain this action, and (2) the constitutionality of the challenged portions of 18 U.S.C. § 1461 on their face and as applied to plaintiffs.

### Justiciability and Standing

■ The twin issues of justiciability and standing are posed in this action. Justiciability concerns the existence of a case or controversy cognizable by the federal courts, while standing involves the stake of the plaintiffs in the outcome of that case or controversy.

■ The requirement of justiciability arises from Article III of the Constitu-

tion, which limits the judicial power of federal courts to cases and controversies. It has long been the rule that no federal court has jurisdiction to declare any statute void for repugnance to the Constitution except as it is called upon to adjudge the legal rights of litigants in actual controversies, Golden v. Zwickler, 394 U.S. 103, 110, 89 S.Ct. 956, 22 L. Ed.2d 113 (1969). Recognizing this principle, the Declaratory Judgment Act, 28 U.S.C. § 2201, limits its remedy to "case[s] of actual controversy." The Supreme Court stated in Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), and reaffirmed in Golden v. Zwickler, *supra*, 394 U.S. at 108, 89 S. Ct. 956, that:

> "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

Standing is "an aspect of justiciability," Flast v. Cohen, 392 U.S. 83, 98, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The "fundamental aspect of standing" is that

> "it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated . . . . [W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Id.*, at 99–100, 88 S.Ct. at 1952. (Footnotes omitted.)

As the Court stated in Association of Data Processing Service Organizations

v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), standing

> "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute · or constitutional guarantee in question . . . ."

To establish standing, the plaintiff must show "a logical nexus between the status asserted and the claim sought to be adjudicated," Flast v. Cohen, *supra*, 392 U.S. at 102, 88 S.Ct. at 1953; Linda R. S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). The "gist of the question of standing" is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); Flast v. Cohen, *supra*, 392 U.S. at 99, 88 S.Ct. 1942, 1952. The personal stake of the plaintiff must be such as to insure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, *supra*, 392 U.S. at 101, 88 S.Ct. at 1953; Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); Sierra Club v. Morton, 405 U.S. 727, 732, 92 S. Ct. 1361, 31 L.Ed.2d 636 (1972).

The government here contends that there is no actual case or controversy and that

> "plaintiffs lack standing to challenge [18 U.S.C. § 1461] in as much as no prosecution has been commenced against plaintiffs under such statute nor have plaintiffs been threatened with prosecution by any person having authority to prosecute under said criminal statute . . . . Plaintiffs have not been indicted, arrested,

or even threatened by a prosecutor in connection with the enforcement of 18 U.S.C. 1461."

Plaintiffs, by contrast, assert that there is an actual controversy and that they have standing:

"The threat of prosecution is neither imaginary nor speculative . . . . Short of actual indictment by the U. S. Attorney, there is no more serious threat the plaintiffs could have waited for before bringing this action. . . ."

When declaratory and injunctive relief against the enforcement of a criminal statute is sought, the Supreme Court has traditionally required that in order to establish justiciability and standing, the plaintiff must show that a sufficiently real and immediate threat of prosecution against him exists. In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that while one plaintiff who had been indicted presented an "acute, live controversy," three others, who sought an injunction against prosecution because they "felt inhibited" by a state statute, did not present a justiciable controversy and lacked standing:

"If these three had alleged that they would be prosecuted for the conduct they planned to engage in, and if the District Court had found this allegation to be true . . . then a genuine controversy might be said to exist. But [they] do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible. . . . [P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases. . . ." 401 U.S. at 42, 91 S.Ct. at 749.

Likewise, in Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the court dismissed an appeal on the ground that it presented no real controversy justifying the adjudication of a constitutional issue. There, plaintiffs sought a declaratory judgment in state court that certain state criminal statutes prohibiting the use of contraceptive devices and the giving of medical advice on their use were unconstitutional. The court noted that while the statutes had been enacted in 1879, apparently only one prosecution had been brought under them, resulting in a lack of "a realistic fear of prosecution." "The fact that Connecticut has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication." 367 U.S. at 508, 81 S.Ct. at 1758.

In Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958), the plaintiff filed a class action seeking declaratory and injunctive relief against enforcement of a state statute providing for segregated seating on buses. The plaintiff was ordered by a bus driver to move to the rear of the bus and refused. Thereupon two police officers boarded the bus and ordered plaintiff to move to the rear, get off, or be arrested. The plaintiff disembarked. The Supreme Court here, however, held that plaintiff *had* established the existence of an "actual controversy" within the meaning of the Declaratory Judgment Act:

"We do not believe that appellant, in order to demonstrate the existence of an 'actual controversy' over the validity of the statute here challenged, was bound to continue to ride the Memphis buses at the risk of arrest if he refused to seat himself [in the rear of the bus]. A resident of a municipality who cannot use transportation facilities therein without being subjected by statute to special disabilities necessarily has, we think, a substantial, immediate, and real interest in the validity of the statute which imposes the disability. . . ." 358 U.S. at 204, 79 S.Ct. at 179.

The direct threat of arrest in *Evers* gave the plaintiff a real and immediate personal stake in the validity of the

challenged statute. *See* Anderson v. Nemetz, 474 F.2d 814 (9th Cir. 1973).

The "threat of prosecution" standard for standing has been restated most recently in Linda R. S. v. Richard D., *supra,* 93 S.Ct. at 1149, in which the Supreme Court noted that its prior decisions "consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."

In Doe v. Bolton, 410 U.S. 179, 93 S. Ct. 739, 35 L.Ed.2d 201 (1973), the Supreme Court appeared to refine the formula for standing and justiciability. Twenty-four individual and two corporate plaintiffs sought declaratory and injunctive relief against enforcement of the Georgia abortion statutes. The district court held that all the plaintiffs had standing but that only Doe, a pregnant married woman, presented a justiciable controversy. In particular, the lower court held that a group of state-licensed physicians who were consulted by pregnant women, while theoretically possessed of standing, did not present a justiciable controversy. 319 F.Supp. 1048, 1052–1054 (N.D.Ga.1970). The Supreme Court modified the judgment as to the physicians and held that they had standing and also presented a justiciable controversy:

"Inasmuch as Doe and her class are recognized, the question whether the other appellants—physicians, nurses, clergymen, social workers, and corporations—present a justiciable controversy and have standing is perhaps a matter of no great consequence. We conclude, however, that the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, *or threatened with prosecution,* for violation of the State's abortion statutes. The physician is *the one against whom these criminal statutes directly operate in the event he pro-*

*cures an abortion* that does not meet the statutory exceptions, and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. *They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.* Crossen v. Breckenridge, 446 F.2d 833, 839–840 (6th Cir. 1971); Poe v. Menghini, 339 F.Supp. 986, 990–991 (D.Kan. 1972)." 93 S.Ct. at 745. (Emphasis added.)

While the lower court in Doe v. Bolton relied primarily on Poe v. Ullman, *supra,* in holding that the physicians did not present a justiciable controversy, the Supreme Court declined to apply that decision to the justiciability issue, noting that the Georgia abortion statutes were "not moribund," 93 S.Ct. at 746. The Court instead accepted the holding of Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), in which it recognized the right of a schoolteacher, not yet criminally charged, to seek a declaratory judgment that her state's anti-evolution statute was unconstitutional even though it had never been enforced in nearly 40 years. Under the standard adopted by the Court in Doe v. Bolton, the fact that the physicians were "the one[s] against whom these criminal statutes directly operate" was held to be sufficient to establish both standing and justiciability. The physicians had not been prosecuted, nor were they threatened with prosecution, under the challenged statutes. The decision seemingly rejected the notion that a threat of prosecution is necessary. Under *Bolton,* rather, all that is required for justiciability and standing is that the criminal statute directly operate against the party seeking relief.

Plaintiffs contend that the Doe v. Bolton standard should be applied to them and that they have standing and present a justiciable controversy because 18 U. S.C. § 1461 directly operates against them in the event that they place the Handbook and Explanatory Sheet in the mails. Defendants, by contrast, argue

that the "threat of prosecution" standard should be applied and that plaintiffs are not faced with a threat of prosecution of sufficient immediacy and reality to establish standing or to present a justiciable controversy.

■ We need not, and do not, decide which of these standards should be applied in this case—whether a real and immediate threat of prosecution is required to establish standing and justiciability, or whether all that is required is that the statute directly operate against the party seeking relief. We hold that at least one group of individual plaintiffs—those members of the class who now or in the future may want to send information about birth control or abortion through the mails—have standing and present a justiciable controversy under either standard.

Under the Doe v. Bolton standard, the criminal statute directly operates against this group of individual plaintiffs. Under the eighth paragraph of 18 U.S.C. § 1461, whoever knowingly places any nonmailable matter in the mails is guilty of a felony and may be fined and imprisoned for up to five or ten years. If the Birth Control Handbook and Explanatory Sheet constitute nonmailable matter within the proscription of the second through eighth paragraphs of the statute, the statute directly operates against those who may want to place those materials in the mails by subjecting them to criminal sanctions in the event that they do so. The individual plaintiffs described above are directly affected by the statute challenged herein in the same manner as were the physicians in *Bolton*. Those physicians constituted a class of doctors who "wish to perform or counsel performance of legal abortions," 319 F.Supp. at 1050, but were subject to criminal penalties under the challenged statutes if they did so.

Even under the stricter "threat of prosecution" standard, this group of plaintiffs has standing and presents a justiciable controversy. Their fears of prosecution are neither "imaginary" nor "speculative." Rather, the Postal Service has already detained the Handbook and Explanatory Sheet on one occasion. Plaintiffs have been informed by the Assistant Regional Counsel of the Postal Service that if they again attempt to place their materials in the mails, the booklets will be withheld and turned over to the United States Attorney for prosecution under 18 U.S.C. § 1461. These plaintiffs have a real and immediate fear that prosecution will be initiated if they submit the materials for mailing. Under such cases as Epperson v. Arkansas, *supra*, Evers v. Dwyer, *supra*, and Anderson v. Nemetz, *supra*, they need not await an actual prosecution to assert their constitutional rights. They can do so now.

The government's reliance on Linda R. S. v. Richard D., *supra*, is incorrect. That case involved a challenge to a Texas criminal statute providing that any "parent" who failed to support his "children" was subject to prosecution. The state courts had construed the statute to not apply to parents of illegitimate children. The mother of an illegitimate child brought a class action to enjoin the local district attorney from refusing to prosecute the father of her child because the child was illegitimate. A divided Supreme Court affirmed the lower court's dismissal of the action on the ground that the mother lacked standing. It is thus apparent that the statute and its impact upon the plaintiff in that case were vastly different from the instant case. In *Linda R. S.*, the Court relied heavily on the fact that the plaintiff failed to show that the statute's enforcement would result in any *direct* injury to her:

> " 'The party who invokes [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some *direct* injury *as the result of* [a statute's] enforcement.' Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923) (emphasis added). . . .
>
> "Here, appellant has made no showing that her failure to secure support

payments results from the nonenforcement, as to her child's father, of Art. 602. . . . [I]f appellant were granted the requested relief, it would result only in the jailing of the child's father. The prospect that prosecution will . . . result in payment of support can, at best, be termed only speculative. . . .

". . . [A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another. . . ." 93 S.Ct. at 1149.

In *Linda R. S.*, therefore, the *target* of the statute—the person against whom the statute directly operated—was the child's *father*; the statute had no direct impact upon the mother. In the instant case, by contrast, those plaintiffs who may wish to place in the mails matter prohibited by 18 U.S.C. § 1461 will suffer direct injury as a result of the statute's enforcement. They are the targets of the statute. The reasoning of Linda R. S. v. Richard D., therefore, compels the conclusion that this group of plaintiffs *has* standing to challenge the constitutionality of 18 U.S.C. § 1461.

Since at least one group of plaintiffs —those individual members of the class who now or in the future may want to send birth control or abortion information through the mails—have standing and present a justiciable controversy, and since the issues are fairly and adequately presented by these plaintiffs, we express no view as to the status of the Associated Students or of the other individual plaintiffs in this action.

*The Constitutionality of the Challenged Statutes*

■ The freedoms of speech and press guaranteed by the First Amendment have such a paramount place in our legal system that any system of prior restraints of expression bears "a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822

(1971); Freedman v. Maryland, 380 U. S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); see Thomas v. Collins, 323 U.S. 516, 529–530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The government "thus carries a heavy burden of showing justification for the imposition of such a restraint." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L. Ed.2d 1 (1971); New York Times Co. v. United States, *supra*, 403 U.S. at 714, 91 S.Ct. 2140.

■ The use of the mails is an important and necessary element of the First Amendment right to free speech; more than fifty years ago, Justice Holmes wrote in dissent in United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921), that "[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." Justice Holmes' now-famous dissent has been adopted by the Court as the correct rule of law. *See* Blount v. Rizzi, 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); Lamont v. Postmaster General, 381 U.S. 301, 305, 85 S.Ct. 1493, 14 L. Ed.2d 398 (1965); Hiett v. United States, 415 F.2d 664, 669 (5th Cir. 1969), cert. denied, 397 U.S. 936, 90 S. Ct. 941, 25 L.Ed.2d 117 (1970).

The prohibition of unsolicited, mailed information about contraceptives or abortions denies to many persons the knowledge, otherwise lacking, necessary to enable them to make an informed decision as to whether to bear children. The magnitude of the problem of unwanted births was discussed in the 1971 Interim Report of the President's Commission on Population Growth and the American Future:

"Estimates made in 1965, based on married women's own reports about their childbearing experience, indicated that one-third of the married cou-

ples who did not intend to have any more children already had at least one unwanted child. In the period 1960–65 nearly 20 percent of all live births were reported as unwanted by their parents. Only one-fourth of all parents claimed to have been completely successful in preventing both unwanted and unplanned pregnancies." Commission on Population Growth and the American Future, An Interim Report to the President and the Congress 26 (1971).

In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that the decision as to whether to undergo or procure an abortion is among those "fundamental rights" whose infringement through regulation can be justified only by the presence of a "compelling state interest."

■ In Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) the Supreme Court noted the right of the individual "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child," in striking down a Massachusetts statute relating to the distribution of contraceptive devices. *See also,* Griswold v. United States, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Individuals have a fundamental right to privacy and personal choice in matters of sex and family planning, and this right encompasses not only the abortion decision, but also the decision regarding whether and what types of

methods of contraception and family planning may be used to prevent conception.

■■ It is apparent from the above discussion and the decisions cited that birth control and abortion are topics of extreme importance to the people of this country and the world, about which there should be open discussion and dissemination of ideas. No interference with the rights involved can be justified without a significant governmental interest. The government, by limiting their objections in this case to the issues of standing and justiciability, has chosen not to defend the constitutionality of the statute and consequently has not presented any interest which might form the justification for this restraint on free speech.[2]

■ The legislative history of 18 U.S.C. § 1461 and 39 U.S.C. § 3001 is singularly unhelpful.[3] The Court is left to speculate that preventing the commercialization of a medical service might be a legitimate governmental interest. Other courts have, on several occasions and in several contexts, upheld statutory schemes which imposed prior restraints upon commercial speech. *See,* for example, Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (newspaper "help-wanted" ads); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) (handbills); Banzhaf v. F. C. C., 132 U.S. App.D.C. 14, 405 F.2d 1082 (1968) (cigarette ads); Pent-R Books, Inc. v. Unit-

2. It has not been alleged, nor could it be seriously argued, that the mailings here might constitute trafficking in obscene materials. *Cf.* United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). Similarly, the matter in question does not fit into any of the other categories of unprotected speech enunciated by the Court in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Since the lifting of prohibitions on the sale and use of contraceptives, and since the Supreme Court's decision on abortions in Roe v. Wade, *supra,* literature like that before the court cannot be termed "crime-inciting."

3. The court notes that the Senate report on an early version of the statute stated that "Section 1461 of the Criminal Code was enacted to prevent the mails from being used to corrupt public morals." Sen. Rep. No. 113, 84th Cong., 1st Sess., in 1955 U.S. Code Cong. & Admin.News, pp. 2210–2211. Any governmental interest in preventing the corruption of public morals cannot justify the infringement on the freedom of speech and the right to privacy that this statute entails. This is particularly so where, as here, the governmental interest that the statute is asserted to further is based upon a personal judgment on which there is a great divergence of views among the public.

ed States Postal Service, 328 F.Supp. 297 (E.D.N.Y.1971) ("sexually-oriented" advertisements in the mail). The reason given for ascribing less vigorous, or in some cases no, First Amendment protection to this speech is its "commercial advertising" context. If a fear of commercialization of family-planning medicine lies as the justification for the statute in the instant case, it is misapplied as to plaintiffs here.

The Supreme Court, in *Pittsburgh Press Co., supra,* recently had occasion to re-examine this somewhat slippery concept of "commercial advertising" in passing upon the constitutionality of a city ordinance which forbid newspapers to carry help-wanted ads in sex-designated columns. In pointing out the boundaries of the doctrine, Justice Powell reiterated that, ". . . [s]ubsequent cases have demonstrated, however, that speech is not rendered commercial by the mere fact that it relates to an advertisement . . .", citing New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The *Sullivan* case involved a paid political advertisement which criticized police action directed against the civil rights movement. Holding that the advertisement was entitled to full protection of freedom of speech, the Court noted that, rather than being "commercial", this publication ". . . communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern." *Id.,* at 266, 84 S.Ct. at 718.

The relevant portions of the statutes presently before the court are:

\*  \*  \*  \*  \*  \*

"Every article, instrument, substance, drug, medicine, or thing, which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose; and

"Every *written or printed card, letter, circular, book, pamphlet, advertisement, or notice* of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means abortion may be produced, whether sealed or unsealed; and

"Every paper, writing, advertisement, or representation that any article, instrument, substance, drug, medicine, or thing may, or can, be used or applied for producing abortion, or for any indecent or immoral purpose; and

"Every description calculated to induce or incite a person to so use or apply any such article, instrument, substance, drug, medicine, or thing—

"Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier. . . ." 18 U.S.C. § 1461 (emphasis added).

\*  \*  \*  \*  \*  \*

"Any *unsolicited advertisement* of matter which is designed, adapted, or intended for preventing conception is nonmailable matter. . . . ." 39 U.S.C. § 3001(e)(2) (emphasis added).

It is clear that the statutes impose a restriction on free speech, a restraint on certain "written or printed card[s], letter[s], circular[s], book[s], pamphlet[s], advertisement[s], or notice[s]" and on "unsolicited advertisement[s]." It is equally apparent that the only reasonable interpretation which may be given to those terms, the only interpretation which will preserve the constitutionality of the statutes, is one which recognizes the inherent difference between commercial solicitation on one hand and informative editorializing on the other. *See* New York Times v. Sullivan, *supra,* 376 U.S. at 266, 84 S.Ct. 710.

**24**

Defendants have attempted to apply the above terms to the mailing by one group of students to another of a Birth Control Handbook and an Explanatory Sheet. Plaintiffs have no financial stake in the distribution of the pamphlet; the mailing was free. Nor do plaintiffs have any demonstrable interest in the family planning aids and techniques which are objectively analyzed and evaluated within the pamphlet. Finally, it is absurd to attribute to plaintiffs some sort of commercial interest in "Dalkon shields" on the basis of their bald statement that the device "is available" at one particular clinic.

It is thus apparent that the Post Office has attempted to expand the term "advertisement" (and those words used in conjunction with that term in the statutes) beyond their commercial sense. Such an expansion offends the First Amendment. To paraphrase the Supreme Court's recent ruling in *Pittsburgh Press, supra,* the materials here resemble the *Sullivan* rather than the *Chrestensen* advertisement. They express a position on social policy and criticize many of the prevailing family planning ideas. They are classic examples of non-commercial speech. *Pittsburgh Press, supra,* 413 U.S. at 385, 93 S.Ct. 2553.

Counsel for plaintiffs shall submit forthwith a proposed judgment in accordance with the opinions expressed herein.

### ORDER DESCRIBING PARTIES BY OFFICIAL TITLE

This civil action was commenced by naming as defendants the following:

1. RICHARD KLIENDIENST, Attorney-General of the United States;

2. E. T. KLASSEN, Postmaster General of the United States Postal Service;

3. FRANCIS A. SCUDDER, Postmaster of Riverside, California.

Rule 25(d)(2) of the Federal Rules of Civil Procedure permits a public officer who is sued in his official capacity to be described as a party by his official title rather than by name.

In order to eliminate orders of substitution pursuant to Rule 25(d)(1) and in order to preserve uniformity in the title of the caption of this case and any subsequent proceedings, the court on its own motion,

Orders as follows:

1. The named public officer defendants shall be described as a party by his official title rather than by name and their names shall be stricken from the caption of the case.