**YOUNGS DRUG PRODUCTS CORP., Plaintiff,**

v.

**William F. BOLGER, et al., Defendants.**

**Civ. A. No. 80–1165.**

United States District Court,
District of Columbia.

Oct. 7, 1981.

824

Francis J. O'Toole, Henry A. Hubschman, Washington, D. C., Jerold S. Solovy, Robert L. Graham, Christopher L. Varner, Frances H. Krasnow, Jenner & Block, Chicago, Ill., for plaintiff.

Asst. U. S. Atty. John D. Bates, Washington, D. C., for defendants.

OPINION

JOHN GARRETT PENN, District Judge.

I

The plaintiff manufactures, sells, and distributes contraceptive products, marketing them through sales to wholesale distributors and chain warehouses for resale to retail pharmacists. It publicizes the desirability and availability of its product line by means of a sales force, and advertisements in trade publications and popular magazines of nationwide distribution. However, the plaintiff has apparently found its marketing strategy insufficient to reach many of its potential customers. Plaintiff now seeks to supplement its "mix" of marketing tools by arranging promotional activities in conjunction with its wholesalers and retailers. The proposed promotional activities relevant to this case are efforts to mail to the public, on an unsolicited basis, three types of mailings. One type is informational pamphlets promoting the desirability and availability of prophylactics in general, and Youngs' products in particular. The second type is flyers exclusively or substantially devoted to promoting prophylactics in general, those made by Youngs, and/or those stocked (and perhaps discounted) by a particular drugstore or chain of drugstores. The third type is multi-page, multi-item flyers mailed out by a drugstore or chain and promoting a large variety of products available and perhaps on discount there, including prophylactics. The plaintiff, its wholesalers and retailers seek to send both types of flyers not just to a drugstore's already-known customers, but to the public.

Youngs has submitted samples of the flyers and promotional materials sought to be mailed. See Exhibit C. There is no dispute that the materials at issue in this case are tasteful expressions on a subject matter that obviously could lend itself to communications that some would find offensive.[1] However, in this case, not only are the materials not obscene, there is no suggestion that they treat the subject matter of the desirability and availability of contraceptive products in a pandering, suggestive, or graphic way. Accordingly, the Court's opinion is limited to materials similar to those submitted by the plaintiff.

II

Youngs' proposed promotional campaign clashes with the clear express language of 39 U.S.C. § 3001(e), which reads in full:

---

1. The Court notes that the plaintiff has submitted a number of more explicit, more potentially offensive advertisements for sexually-oriented products which, Youngs alleges, the Postal Service permits others to mail. See Exhibit E. However, all those advertisements are mailed *on a solicited basis*, being either specifically ordered by the addressee or contained in a specifically-ordered publication. Obviously, different interests are brought into play when materials are furnished on request, than when they are sent unsolicited to a member of the public. *Rowan v. Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). Moreover, the statute in question reaches only materials mailed *on an unsolicited basis*.

(1) Any matter which is unsolicited by the addressee and which is designed, adapted, or intended for preventing conception (except unsolicited samples thereof ˌ mailed to a manufacturer thereof, a dealer therein, a licensed physician or surgeon, or a nurse, pharmacist, druggist, hospital, or clinic) is nonmailable matter, shall not be carried or delivered by mail, and shall be disposed of as the Postal Service directs.

(2) Any unsolicited advertisement of matter which is designed, adapted, or intended for preventing conception is nonmailable matter, shall not be carried or delivered by mail, and shall be disposed of as the Postal Service directs unless the advertisement—

(A) is mailed to a manufacturer of such matter, a dealer therein, a licensed physician or surgeon, or a nurse, pharmacist, druggist, hospital, or clinic; or

(B) accompanies in the same parcel any unsolicited sample excepted by paragraph (1) of this subsection.

An advertisement shall not be deemed to be unsolicited for the purposes of this paragraph if it is contained in a publication for which the addressee has paid or promised to pay a consideration or which he has otherwise indicated he desires to receive.

Youngs' promotional campaign also conflicts with Postal Service regulations interpreting the reach of the statute. Section 123.434 of the Domestic Mail Manual reads, in pertinent part:

Unsolicited advertisements for articles or things which are designed, adapted or intended for preventing conception are nonmailable, except . . . when the mailer has no commercial interest in any such item.[2]

In early 1979, the Postal Service traced an allegation of an unsolicited mailing of advertisements for contraceptive products to the Ketchum Drug Company of New York City, a wholesaler of Youngs' product line. The Service warned Ketchum that the mailing violated the statute. Youngs and Ketchum noted in letters to the Service their view that under *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the Service could not constitutionally restrict the mailing of a drugstore circular listing on the back page a notice that the pharmacy carried prophylactics, with quantities and prices. The letter further stated that "this circular lists many many items and TROJAN is just one among many traditional drugstore items listed." At that time Youngs also furnished the Service with a copy of a flyer devoted exclusively to promoting contraceptives on sale at $5.49 at a particular drugstore, and requested the Service's legal opinion on the mailability of both types of flyers, as well as of promotional pamphlets. The Service rejected the view of Youngs and Ketchum in a letter of February 15, 1980. A reasonable reading of that letter is that it addressed all three types of mailings with respect to which there had been recent correspondence between Youngs and the Service, stating the Service's position that the mailing on an unsolicited basis of both types of flyers, as well as promotional pamphlets, would violate 39 U.S.C. § 3001(e). Thereafter, the plaintiff filed this action, claiming that the statute in question unconstitutionally violates the First, Fifth and Ninth Amendments to the United States Constitution, and that Youngs and Ketchum were refraining from distributing advertisements mentioning, promoting or explaining Youngs' products because of the Service's warning. On July 10, 1981 the Court de-

---

**2.** The exemption from coverage that the regulations provide to mailers without a commercial interest is a result of the Postal Service's acceptance of, and its interpretation regarding, the decision in *Associated Students v. Attorney General*, 368 F.Supp. 11 (C.D.Cal.1973) (three-judge court) (holding this statute unconstitutional as applied to a student group seeking to mail detailed information about birth control to private homes where off-campus students resided).

nied Youngs' motion for a preliminary injunction.[3]

## III

The Court concludes that the statute in question, by its plain language, prohibits all three types of mailings in this case.[4] Hence, the Court must reach the issue of the constitutionality of the statute as applied to these mailings, in particular, whether the absolute statutory ban on all three types of mailings violates the First Amendment.

The Court notes the opinion in *Associated Students, supra,* which held the statute at issue unconstitutional as applied to mailers who seek to inform addressees, on an unsolicited basis, about the desirability and availability of birth control devices and practices, but have no personal economic interest in doing so. As noted above, the Service has acquiesced in that interpretation.

■ That case set forth various points concerning the constitutionality of the statute that bear repeating here. First, the statute constitutes a prior restraint of expression, against the constitutional validity of which there is a "heavy presumption." *Associated Students, supra* at 21 (citing, *inter alia, Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). Second, "the use of the mails is an important and necessary element of the First Amendment right to free speech...." *Id.* (citing, *inter alia, Blount v. Rizzi,* 400 U.S. 410, 416, 91 S.Ct. 423, 428, 27 L.Ed.2d 498 (1971)). Third, "the prohibition of un-

solicited, mailed information about contraceptives ... denies to many persons the knowledge, otherwise lacking, necessary to enable them to make an informed decision as to whether to bear children," an outcome which is troubling from the point of view of constitutional law since, under the holdings of *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), "individuals have a fundamental right to privacy and personal choice in matters of sex and family planning ... encompass[ing] ... the decision regarding whether and what types of methods of contraception and family planning may be used to prevent conception." *Associated Students* at 22. The final relevant point from that opinion is its conclusion that, applying the law to the "unsolicited advertisement" language of the statute in question, "the only reasonable interpretation which ... will preserve the constitutionality of the statute[ ], is one which recognizes the inherent difference between commercial solicitation on one hand and informative editorializing on the other." *Id.* at 23.

In this case all three types of proposed mailings are commercial solicitations. Accordingly, this Court must consider this case not only in the light of the considerations that formed the basis of the *Associated Students* opinion, but, more importantly, within the framework set forth by the Supreme Court for commercial speech cases. Moreover, the issue in this case is complicated further because, while on the one hand, this *mailer,* because of its commercial inter-

---

3. The Court was particularly concerned that the defendants might suffer irreparable harm, while it did not appear that the plaintiff ran a substantial risk of such harm. In particular, were the Court ultimately to rule on the merits in favor of the Government's position, the Court feared that the Government's interest in assuring the nonoccurrence of the statutorily-prohibited mailings would be defeated. Indeed, had Youngs taken advantage of a preliminary injunction to launch a huge mass mailing of advertisements and promotional materials to the public, it might have achieved the bulk of the relief it sought on the merits, no matter how the Court ultimately ruled on them.

4. Indeed, the Service argues not that the statute can be read expansively to reach, but rather that it especially covers, multi-item drugstore flyers containing advertising for contraceptives. *See* Defendants' Supplemental Memorandum, at 7 (§ 3001(e)(2) "proscribes the mailing of unsolicited commercial advertisements concerning contraceptives, essentially in the form of drugstore flyers, which are precisely the materials with which the private home owner is likely to be overwhelmed").

est, has less freedom than the *Associated Students* mailers from regulation of its efforts to communicate with the public as it sees fit, on the other hand, these *mailings*, particularly the flyers, appear to be less explicit and less potentially offensive to sensitive addressees than was the detailed booklet on birth control and abortion practices and resources in *Associated Students*.

## IV

*The Commercial Speech Tests*[5]

■ In a series of cases from the last few years, the Supreme Court has made clear that commercial speech enjoys First Amendment protection. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). However, while commercial speech is constitutionally guaranteed expression, it is accorded less protection from government regulation than noncommercial speech. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *Virginia Pharmacy, supra; Bates, supra.* Indeed, "certain features of commercial speech differentiate it from other varieties of speech . . . [and] may also make inapplicable [to commercial speech] the prohibition against prior restraints." *Friedman v. Rogers*, 440 U.S. 1, 10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979).

■ Whether the First Amendment protects commercial speech "turns on the nature both of the expression and the governmental interest served by its regulation," *Central Hudson Gas & Electric Corp. v.*

*Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). However, two recent Supreme Court cases make clear that even a strong and clear governmental interest served by the regulation normally does not outweigh the First Amendment interest in expression. *Central Hudson, supra, Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). Those cases set out a step-by-step analytical framework for commercial speech cases. By applying that test, in light of the facts of those two cases and the holdings in both that the government regulations were impermissible, it is clear that the three types of mailings before this Court may not be absolutely banned.

■ The Supreme Court applied the following analysis in those two cases. Since the First Amendment extends to commercial speech because of the informational function of advertising, *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978), no First Amendment issue is raised by prohibition of advertising that relates to illegal activity, *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973), or deceives. *Ohralik, supra* at 464–65, 98 S.Ct. at 1922–23. However, "the government's power is more circumscribed" when it attempts to suppress commercial messages that accurately inform the public about lawful activity, as is the case here. *See Central Hudson, supra*, 447 U.S. at 564, 100 S.Ct. at 2350. In that event, the government "must assert a substantial interest to be achieved by [the] restrictions." If it does, as it has in this

5. The Court notes that the plaintiff argues in the alternative that this is not a commercial speech case at all, but rather one of pure speech, albeit in the form of an ad. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (a purchased ad, run in a newspaper and conveying information to the reader and proposing a cash contribution to the purchaser of the ad, held to be pure speech). However, an editorial ad seeking contributions to a fund from like-minded readers is clearly distinguishable from any of the

promotional materials involved in this case. In this type of case, the critical distinction between pure and commercial speech is whether the speaker has a commercial interest, as the electric utility had in *Central Hudson* and as manufacturers, distributors, and retailers of prophylactics have in this case. Thus, this is a commercial speech case with respect to all three types of proposed mailings, even though parts of Youngs' promotional pamphlets are probably indistinguishable from parts of the booklets mailed out in *Associated Students*.

case, then the restriction is "in proportion to that interest." The *Central Hudson* opinion is particularly helpful since it spelled out the two requirements of that restriction/interest proportionality test:

First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

*Id.*

## V

*Application of the Commercial Speech Test to this Case*

a. *The substantiality of the governmental interest*

This Court finds that the Government does have a substantial interest to be achieved by this statute.[6] The Government states that interest as "protecting the privacy of individuals in their homes." Since there is a statute, upheld by the Supreme Court in *Rowan v. Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), that affords an addressee an absolute right to prohibit any mailings to him from any mailer who has ever sent him a mailing that he, in his sole discretion, deems "erotically arousing or sexually provocative," 39 U.S.C. § 3008(a), the governmental interest is more accurately stated as protection of the privacy of individuals in their homes from even one mailing that, because of its sexual subject matter, is likely to offend some sensitive addressees. Especially when the related interest in preventing such material from falling into the hands of the children of addressees who do not wish their children to be exposed to it, is considered, this Court concludes that the governmental interest is a substantial one.

b. *The "Directness" Prong*

The Supreme Court ruled in *Central Hudson* that the New York Public Service Commission's complete prohibition of electric utility advertising promoting the use of electricity *did* directly advance the state interest in energy conservation since "there is an immediate connection between advertising and demand for electricity." *Central Hudson, supra* 447 U.S. at 569, 100 S.Ct. at 2353. There is a similarly "direct link" in this case between the state interest, namely, the protection of the privacy of individuals from exposure to offensive material, even once, in their homes and the means of advancing that interest; namely, a prohibition of all mailings, on an unsolicited basis, promoting contraceptives by mailers with a commercial interest in such promotion. Moreover, as long as regulations on commercial speech First Amendment rights *directly* advance the governmental interest, it is constitutionally sufficient that they reduce the problem; they need not eliminate it. *Cf. Bates, supra* (invalidating Bar prohibition of attorney advertising because the regulation only *indirectly* advanced the state interest in maintaining high standards of attorney integrity). Youngs has stressed the fact that under the statute and the Postal Service regulations interpreting it, a mailer without a commercial interest in contraceptives may expose individuals in their homes to possibly offensive material. Indeed, Youngs argues, such a mailer may mail substantially the same sort of pamphlet that Youngs, its wholesalers and retailers may not. Youngs' argument simply misses the point that the standard is "direct link," not complete solution. Moreover, the means would seem to be quite effective in dealing with the problem of unwanted mailings. Supreme Court opinions have recognized that commercial speech has a greater hardiness, based on the profit motive that fuels it, than noncommercial speech. *See Virginia Pharmacy, supra* 425 U.S. at 771–72 n. 24, 96 S.Ct. at 1830–31 n. 24 ("commercial speech may be more durable than

---

6. The Court notes its surprise to learn that in *Associated Students, supra* at 22, the Government "did not present any interest which might

form the justification for this restraint on free speech."

other kinds"; "advertising is the *sine qua non* of commercial profits"; an "attribute [of commecial speech is its] hardiness"); *Bates, supra* 433 U.S. at 380–81, 97 S.Ct. at 2707. Thus, especially since, generally speaking, noncommercial mailers do not mail the avalanche of materials that commercial mailers do,[7] a ban on commercially-inspired mailings will go far to achieve the governmental objective involved in this case, and is hardly "totally ineffectual," as Youngs argues. Plaintiff's Reply Memo, at 10.

### c. *The Least Restrictive Means Prong*

■ Reaching the last part of the test, this Court finds, as did the Supreme Court in *Central Hudson*, that this regulation of commercial speech is constitutionally impermissible because it is "more extensive than is necessary to serve the [governmental] interest." *Central Hudson, supra,* 447 U.S. at 572, 100 S.Ct. at 2354. As in that case, the Government here "has not demonstrated that its interest . . . cannot be protected adequately by more limited regulation of appellant's commercial expression." *Id.* 447 U.S. at 570, 100 S.Ct. at 2354. In *Central Hudson*, the Court suggested a number of obvious less restrictive means that New York had at its disposal to further its conservation policy. For instance, the Court noted, the State "could attempt to restrict the format and content of Central Hudson's advertising . . . for example, [by] requir[ing] that the advertisements include information about the relative efficiency and expense of the offered service. . . ." *Id.* 447 U.S. at 571, 100 S.Ct. at 2354. Likewise, in *Bigelow v. Virginia*, 421 U.S. 809, 824, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975), reviewing a conviction for violation of a statute prohibiting acceptance of advertising promoting abortion clinics, the Court noted an obvious less restrictive alternative (though its holding struck down the statute on other sufficient grounds). *See also* Comment, *First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine*, 44 U.Chi.L. Rev. 205, 249–51 & nn. 239–40 (1976).

Here the effect of the statute and the regulations is that under no conditions may a commercially-interested mailer mail to the public on an unsolicited basis, any material promoting or mentioning the desirability or availability of contraceptives. The Court concludes that under the line of Supreme Court commercial speech cases cited *supra*, the application of the statute and the regulations to the three types of mailings involved in this case cannot withstand less-restrictive-alternative scrutiny.

■ Therefore, this Court will order, first, that multi-item drugstore flyers containing tasteful promotion of contraceptives, may be mailed to the same extent that such flyers could be mailed if they did not contain such promotion.[8] The Court relies on *Consolidated Edison, supra*, in particular, where the Supreme Court reviewed New York's highest court's determination that bill inserts promoting nuclear power plants intruded upon individual privacy because the public "ha[s] no choice whether to receive the insert and the views expressed in the insert may inflame their sensibilities." The Court ruled that the fatal flaw in that determination was an "err[oneous] assessment of the seriousness of the intrusion." *Id.* 447 U.S. at 541, 100 S.Ct. at 2335. The same is true here. As the Court noted there, again in words that apply equally to the insertion in multi-item[9] drugstore

---

7. The Court recognizes, though, that the emergence of well-organized direct mail efforts by mailers with an ideological interest has lessened to some extent the "commonsense differences between commercial speech and other varieties."

8. The Court reiterates that it has no occasion on the facts of this case to consider the mailability of such flyers if the promotion they contain for contraceptive materials is done in a tasteless or palpably offensive style. For reasons stated in the text, however, this Court doubts that drugstore flyers present a serious risk of frequently containing tasteless or palpably offensive promotion of any product.

9. The Court notes that *many* of the items listed may be offensive to some one. For instance, in the drugstore flyer from the Park Plaza Pharmacy of the Bronx, New York, submitted to this Court as an exhibit in this case, there are

flyers of tasteful promotion of contraceptive products, "even if a short exposure to [the petitioner's] views may offend the sensibilities of some consumers, the ability of government 'to shut off discourse solely to protect others from hearing it [is] dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.'" *Id.* This Court simply must conclude that where the exposure is as short as it will be in the case of a tasteful promotion for prophylactics in a multi-item drugstore throw-away flyer, and hence where the risk of offending the sensibilities of a large number of addressees seems so speculative, there has been an "erroneous assessment of the seriousness of the intrusion." There has been an *insufficient showing* that *substantial* privacy interests will be invaded in an *essentially intolerable* manner.

■ Second, with respect to flyers and pamphlets devoted exclusively or substantially to promoting the desirability or availability of contraceptives, this Court will order that such materials are mailable only under the following conditions. First, they must be mailed in an envelope that completely obscures from the sight of the addressee the contents. Second, the envelope must contain a prominent notice stating in capital letters that the enclosed material has not been solicited in any way by the recipient. Third, the envelope must contain a prominent warning that the contents are "promotional material for contraceptive products." Fourth, the envelope must contain a notice, in less prominent lettering than the warning and the other notice, but not in "fine print," that federal law permits the recipient to have his name removed from the mailing list of the mailer of that envelope, and citing to 39 U.S.C. § 3008(a).

The Court concludes that, with respect to materials devoted exclusively or substantially to promoting contraceptives, nothing less than the envelope, notice and warning requirement set out above would be a reasonable less restrictive alternative for advancing the governmental interest in protecting the privacy of individuals in their homes from mailings they find offensive. The combination of the envelope's complete obscuring of the contents, the notice that the material is unsolicited, and the warning indicating the predominant subject matter of those contents, substantially enhances the "wastebasket" remedy. Taken together, they make it likely that persons who would find the contents offensive will resort to that remedy without opening the envelope and being offended. The fourth requirement substantially enhances the Section 3008(a) remedy by alerting addressees to the existence of the statute as a protection against any future mailings from that mailer.

Finally, the format ordered by this Court goes far in achieving a companion governmental interest of particular concern to the Court. Due to the sexual nature of the subject matter at issue in this case, there is an interest in ensuring, to the extent constitutionally permissible, that it not fall into the hands of children whose parents do not wish them to be exposed to subject matter of a sexual nature, regardless of the style of its presentation. The multi-item flyer does not present a serious threat to that interest, since the ad for contraceptives in such flyers will likely be—as it is in the exhibit submitted to the Court in this case, *see* Exhibit C—buried in the middle pages of the flyer.[10] However, it is a central concern in the case of the "exclusive or substantial" flyer and the pamphlet, whether sent by a local retailer or Youngs into the home. Yet in *Consolidated Edison*, even though the unsolicited, possibly offensive material *was being mailed to the home*, the Supreme Court nevertheless cited with approval the rule of *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (possibly

ads for a number of feminine products, mention of which may well be offensive to sensitive addressees.

**10.** The Court notes that if the promotion of contraceptives appears on the front page of the flyer, or by some other manner of graphic de-

sign dominates the rest of the flyer, then a court might decide to treat the flyer as one "devoted in substantial part to the promotion of contraceptives." In that event, the flyer would come under the envelope, notice, and warning requirement.

offensive material in court hallway) that the recipients of a message they find offensive have an "averting the eyes" or "wastebasket" remedy. Pamphlets and flyers promoting contraceptives, when mailed in an opaque envelope containing the warning and notices ordered by this Court, are at least as good an example as the inserts promoting nuclear energy in *Consolidated Edison* of the sufficiency of the "wastebasket" remedy: In both instances, the addressee "may escape exposure to objectionable material simply by transferring the bill insert from envelope to wastebasket." *Consolidated Edison, supra* 447 U.S. at 542, 100 S.Ct. at 2336. Moreover, it is quite unlikely that drugstore flyers will contain tasteless or graphic promotion of contraceptives. No drugstore will send out flyers that do not prominently feature its name. Once a drugstore prominently features its name on its flyers, it sets itself up to be the target of a boycott by any recipient offended by them.[11] Indeed, this check will be so effective, as a practical matter, that this Court can certainly imagine that in some communities or in certain neighborhoods or areas therein, drugstores will refrain from including any promotion of contraceptive products in any of their flyers notwithstanding this Court's holding in this case.

The Court believes that it has devised a less restrictive alternative that does not limit the commercial speech rights of mailers any more than necessary in order to significantly advance the Government's substantial interests in protecting personal privacy and keeping subject matter of a sexual nature from falling into the hands of children inadvertently. On the other hand, the Court concludes that this alternative, unlike some of the others that it has considered such as a pre-mailing followed by a mailing only to those who have returned a card soliciting further promotional materials, does not impose a serious financial burden on the exercise of those rights.

As in any balance, of course, the requirements ordered by the Court do not achieve, to the fullest extent imaginable, all the aims of the competing interests. In particular, these requirements do not provide absolute protection against having material concerning contraception occasionally fall into the hands of inquisitive children. However, the requirement of an opaque envelope and the fairly technical language of the warning, that is, "contraceptive products" as opposed to, say, "materials having to do with sex," will reduce, though not to zero, the above problem. Especially where free speech rights are on the other side of the balance, no reduction to zero on the governmental interest side can be realistically expected. In sum, this Court is satisfied that it has struck the balance that the Constitution mandates.[12]

11. That "remedy" will be an especially effective check on tasteless promotion of contraceptives in multi-item drugstore flyers in many communities, where, as in this area, the major drugstores deal in everything from prescription drugs and general health care products, to groceries, magazines and counter meals.

12. This Court has also considered the defendants' argument that the statute is a reasonable restriction on the manner of Youngs' exercise of its free speech rights. The Court concludes that the statute and the regulations go to the content of the communication—information about contraceptives—and not to the manner of that communication—unsolicited mailing of commercial information. Indeed, were the Postal Service really in the business of restricting this *manner* of communication, few of us would recognize our mailboxes.