**Tommy HIETT, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 25732.**

United States Court of Appeals Fifth Circuit.

Aug. 26, 1969.

Lee A. Chagra, El Paso, Tex., for appellant.

Andrew L. Jefferson, Jr., Asst. U. S. Atty., San Antonio, Tex., Ray Caballero, Asst. U. S. Atty., Ernest Morgan, U. S. Atty., El Paso, Tex., for appellee.

Before THORNBERRY and SIMPSON, Circuit Judges, and CASSIBRY, District Judge.

THORNBERRY, Circuit Judge:

This is an appeal from a judgment of conviction under 18 U.S.C. § 1714 (1964), which prohibits the use of the United States mails to distribute written material "giving or offering to give information concerning where or how or through whom a divorce may be secured in a foreign country, and designed to solicit business in connection with the procurement thereof." Appellant contends that this statute is unconstitutional in that it violates the first amendment. We agree and reverse his conviction.

The case was tried without a jury on stipulated facts. Appellant admitted that he had been doing business as Mexico Divorce Consultants, Ltd., at El Paso, Texas, in association with attorneys licensed to practice law in Mexico. Having received inquiries frrom persons who purported to be interested in securing divorces, he replied by placing in the United States mails letters offering the services of his firm and explaining the procedures to be followed in obtaining both bilateral and ex parte Mexican divorces. Since appellant thus admitted all elements of the offense, he was found guilty as charged on two counts of violating § 1714. The trial court overruled his contention that the statute was unconstitutional. He was sentenced to five months' imprisonment on the first count and fined $5,000 and given a suspended sentence of one year on the second.

The challenge of unconstitutionality against § 1714 presents two main issues. The first is whether Congress may selectively exclude printed matter from the mails, irrespective of its status under the first amendment, solely on the basis of the power to "establish Post Offices and post Roads." U.S.Const. Art. I § 8. The second issue is whether § 1714 is a law "abridging the freedom of speech" within the meaning of the first amendment.

## I. THE APPELLANT'S CONDUCT AND ITS RELEVANCE

Before considering the Constitutional issues involved here, we eliminate one question. Appellee points out that when § 1714 was enacted in 1939, the principal evil against which it was directed was the fraudulent solicitation of Mexican divorces that often proved, to the parties' dismay, to be invalid in the United States. Appellee argues that appellant's conduct in this case presents precisely the evil the statute was enacted to prevent. There were statements in appellant's letters to the effect that "[m]ost courts recognize Mexican divorces as valid," and that service on the spouse for an ex parte divorce could be had by publication. These statements, appellee argues, were misrepresentations because (1) Mexican bilateral divorces were actually *invalid* in every state of the Union except New York and possibly Arizona and Alabama, *see* Annot., 13 A.L.R.3d 1419, 1425, 1441 (1967), and (2) not even New York recognized ex

parte divorces in which one party was "served" by publication, *see* Rosenstiel v. Rosenstiel, N.Y.App.1965, 16 N.Y.2d 64, 262 N.Y.S.2d 86, 209 N.E.2d 709, 13 A.L.R.3d 1401.

■ Appellant's actual conduct, however, is largely irrelevant here. His attack is on the face of the statute itself. He admits violation of the terms of § 1714, and his conduct is therefore not in issue except as it may furnish an aid to our determining the breadth of application of the statute. It is well settled that if the statute under which appellant has been convicted is unconstitutional, he has not in the contemplation of the law engaged in criminal activity; for an unconstitutional statute in the criminal area is to be considered no statute at all.

Beyond this well-established truth, there is another good reason for our not considering appellant's conduct, and that is that we have no standards by which to do so. Section 1714 indiscriminately prohibits the mailing of certain types of communications, without regard to fraudulent intent. Furthermore, although appellant's statements may have been misleading, there is not a scintilla of evidence in the record indicating any of the elements of fraud. Under the circumstances, these misleading statements may have been honest mistakes as to the law made by an attorney who drafted the letters, or, worst yet, statements that were conceivably true for some limited purposes, the misleading tendencies of which the attorney did not see. *Cf.* 37 C.J.S. Fraud § 3 (1943). Accordingly, the conviction must stand or fall on the constitutionality of § 1714 alone, and we proceed now to the Constitutional questions.

## II. THE EFFECT OF THE POSTAL POWER

■ We are met at the outset with appellee's contention that Congress may exclude "objectionable" materials from the mails merely on public policy grounds even if it would be under a disability to regulate the existence of the materials themselves or the underlying scheme for which they are used. On this basis, appellee concludes that Congress can prohibit the use of the mails to send out information to solicit divorces, even assuming it is unable, under any of its powers, to outlaw the solicitation itself. We reject this argument and hold that a statute excluding printed communications from the mails must be tested for consistency with the first amendment.

The postal power has been construed with great variation throughout its history, and there is an abundance of dicta that would support appellee's contentions if construed in the absence of more recent decisions. Originally, the power was viewed with a narrowness that today seems surprising. In one early case, the power was limited strictly to "the designation of roads on which the mails are to be transported." United States v. Railroad Bridge Co., C.C.N.D.Ill.1855, 27 Fed.Cas. p. 686, No. 16,114. After 1876, however, the pendulum swung the other way, and the postal power was given rapidly expanding latitude. *See* Kohl v. United States, 1876, 91 U.S. 367, 23 L.Ed. 449; Legislative Reference Service, Library of Congress, The Constitution of the United States of America: Analysis and Interpretation 313 (1964). The pioneer case of Ex parte Jackson, 1878, 96 U.S. 727, 24 L.Ed. 877, upheld the first Congressional use of the power to influence public policy aims. The Supreme Court established a broad postal power: It affirmed a conviction under a statute excluding lottery information from the mails, on the theory that "[t]he right to designate what shall be carried necessarily involves the right to determine what shall be excluded." Although *Ex parte Jackson* also emphasized the "necessity of enforcing [the postal laws] consistently with the rights reserved to the People, of far greater importance than the transportation of the mail," the decision spawned a line of cases indicating in dictum that the postal power includes an absolute power of censorship. These cases, in contrast to the original narrow in-

terpretation given the post-roads clause, developed the "privilege" doctrine: They viewed the use of the mails as a privilege to which "Congress * * * may annex such conditions * * * as it chooses." Public Clearing House v. Coyne, 1904, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092; see also Ex parte Rapier, 1892, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; McCrossen v. United States, 10th Cir. 1965, 339 F.2d 810, 11 A.L.R.3d 1268.

■ Today, whatever the status of the privilege doctrine, the cases establish beyond doubt that the postal power may be used broadly to achieve social and economic results that Congress deems beneficial. For example, the power unquestionably may be used to exclude utterances that are not protected speech on a judgment by Congress that they are harmful. See, e. g., Parr v. United States, 1960, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (mail fraud); Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (obscenity). It may be used to enforce economic regulatory schemes such as the securities laws. Electric Bond & Share Co. v. SEC, 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936. Congress evidently even has the power to encourage certain categories of speech over others when it deems that the public interest will be served by its doing so, since it has "a broad power of classification and need not open second-class mail [which is less expensive] to publications of all types." Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586. In short, today the permissible use of the postal power is similar in breadth to the uses to which the commerce and tax powers have been put. See Sigler, Freedom of the Mails: A Developing Right, 54 Geo.L.J. 30, 37 (1965).

■ However, it is one thing to say, as the cases hold, that a power of Congress may legitimately be used to protect the public health, safety, welfare, or morals, and quite a different thing to say, as appellee apparently says, that its

use for police power purposes automatically overrides the specific limitations on Congressional power that are contained in the Bill of Rights. Admittedly, the freedom of speech is not absolute; but neither may the powers of Congress, even though delegated by the Constitution, be regarded as absolute, since they would obliterate the first amendment if asserted to their logical extreme. Thus both the commerce power and the tax power have been held to be circumscribed by the first amendment. See Red Lion Broadcasting Co. v. FCC, 1969, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371; Murdock v. Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292. Similarly, regulation of speech through the postal power, although it is authorized where necessary to effect legitimate legislative ends, is to be tested against the first amendment. Recognition of this first amendment limitation has been slow in developing, partly because of the lingering presence of the privilege doctrine. The cases still contain troublesome, atavistic language that implies an absolute power of censorship. As recently as 1965, for example, Tenth Circuit stated as follows:

Under Art. 1, § 8, cl. 7 of the Constitution, Congress has the power to " * * * establish Post Offices and post Roads." It has long been the law that this power embraces the regulation of the entire postal system and includes, within constitutional limitations, the right to determine what may be carried in the mails and what may be excluded. Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092, Ex parte Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; In re Jackson, 96 U.S. 727, 24 L.Ed. 877. Congress has exercised that power by providing in section 1718 that certain types of material shall be considered to be nonmailable matter. Therefore, the prohibitions contained in that statute must be construed in the light of the regulatory power of Congress rather than in the light of any First Amendment

limitation. In other words, in our consideration of this case, we must keep in mind that the gist of an offense under section 1718 is not the making and uttering of the prohibited writing. It is the depositing in the United States mail of an envelope containing on the outside thereof the prohibited writing. The statute is not, by its express terms, limited solely to "libelous" statements. It encompasses also statements which are "scurrilous", "defamatory" or calculated and obviously intended to reflect injuriously upon the character or conduct of another. It may be conceded, therefore, that statements claimed to be libelous must be measured by the law of libel and it has been so held. American Civil Liberties Union v. Kiely, 2 Cir., 40 F.2d 451. But, that does not mean that the other types of prohibited statements must be construed in the light of the law of libel. To the contrary, we think that writings on envelopes may be prohibited by Congress under its regulatory power even though they are not strictly libelous.

McCrossen v. United States, 10th Cir. 1965, 339 F.2d 810, 813. The *McCrossen* court went on to hold that the mailing of an envelope with words strongly critical of President Eisenhower printed on its cover was constitutionally made criminal by 18 U.S.C. § 1718 (1964). One problem with this privilege approach is that today the use of the mails is not a mere convenience but a *sine qua non* for many types of communications. To cite an extreme example, absolute power to exclude a magazine from the mail arbitrarily would not be regulatory power; it would be, like the power to levy oppressive taxes, the power to destroy.

We find that the trend of cases, and especially the more recent decisions of the Supreme Court, has given the privilege doctrine the burial it merits. The need for Congress to respect the provisions of the Bill of Rights in the exercise of the postal power has long been emphasized. Ex parte Jackson, 1878, 96 U.S. 727, 24 L.Ed. 877; United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 1921, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704 (Holmes dissent); Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (by implication); Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 66 S.Ct. 465, 90 L.Ed. 586; Manual Enterprises v. Day, 1962, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639; Lamont v. Postmaster General, 1965, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398. The now-famous Holmes dissent in *Milwaukee Social Democratic Pub Co.* states that "[t]he United States may give up the post office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues." In another dissent, in the *Roth* case, Mr. Justice Harlan wrote: "The hoary dogma of Ex parte Jackson * * * and Public Clearing House v. Coyne * * * that the use of the mails is a privilege on which the Government may impose such conditions as it chooses, has long since evaporated." In *Roth*, if not in *Milwaukee*, the majority clearly agreed, because it discussed at length the question whether obscene materials sent through the mail constituted protected speech, an inquiry that would have been meaningless had the Court subscribed to the privilege doctrine. *See also* Ginzburg v. United States, 1966, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31. In *Lamont*, the latest pronouncement of the Supreme Court on the matter, the Court held a statute requiring detention of Communist propaganda mail from foreign countries unconstitutional as applied because the addressee had to return a special card to the Post Office in order to receive each such piece of mail addressed to him. Citing the Holmes dissent in *Milwaukee Social Democratic Publishing Co.*, the Court stated: "We conclude that the Act as construed and applied is unconstitutional * * * as a limitation on the

unfettered exercise of the addressee's First Amendment rights."

In light of these cases, we hold that the use of the mails is not a privilege to which the Congress or the Post Office can attach any condition it chooses. When a postal law affects expression, the exercise of the postal power must be tested against the first amendment. This does not mean, of course, that no printed matter may be excluded; for we recognize that the postal power is a broad one that extends not only to the designation of post offices and post roads, but also to the regulation of the mails for public policy purposes. It does mean, however, that a statute affecting expression, even if enacted under the postal power, is constitutional only if either (1) it meets the twin tests of specificity and narrowness or (2) the expression it affects is not protected speech.

## III. THE EFFECT OF THE FIRST AMENDMENT

We come, therefore, to the second issue in this case: Whether § 1714 is consistent with the first amendment. At the outset, there can be no doubt that the statute infringes some expression. It defines all information about foreign divorces designed to solicit business in procuring a divorce as non-mailable matter, regardless of its truth or falsity, regardless of relationship of the parties between whom it is sent, and without limitation as to whether the addressee has requested the information. In testing § 1714 against the first amendment, we must first ascertain whether the expression it infringes has any Constitutional protection as speech. If so, we must then determine whether it measures up to the strict standards that statutes regulating speech must meet in order to stand.

A. *Information and Solicitation Concerning Legal Rights as Protected Speech*

Appellee contends that the solicitation of foreign divorces "is not a form of speech entitled to first amendment protection, just as obscene or abusive language, threats, or fighting words are not protected." If this were true, we would agree without further discussion that such communications could be excluded from the mails. It is well established that "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or " 'fighting' words—*those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."* Chaplinsky v. New Hampshire, 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (emphasis added). It follows as a corollary that these utterances can be censored from the mail. *Cf.* Parr v. United States, 1960, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277.

We do not find that information about the exercise of legal rights, even when it relates to the procurement of a divorce in a foreign country, may be summarily censored "without raising any Constitutional problem" in the same manner as obscenity, fraud, libel, or threats, especially when the information has been requested by the addressee. It may well be that the giving of such information could be regulated, or conceivably, under certain circumstances, prohibited entirely, but this is not because the information is not "speech," and any regulation would have to be effected by a statute drawn with narrow specificity and aimed at protecting only overwhelmingly important interests that the legislature is charged with protecting. We find no basis for appellee's contention that an undiscovered lode of unprotected expression, similar to other long-established exceptions to the first amendment, has awaited our finding it in this case. Moreover, if the test for such a category of expression is, as stated in *Chaplinsky*, that "by [its] very utterance [it] inflict[s] injury or tend[s] to incite an immediate breach of

the peace," we can find no justification for establishing one here. In fact, recent decisions of the Supreme Court indicate that "solicitation" is an area fraught with Constitutional problems of the first magnitude, because it involves definite pockets of protected speech. *See* Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 1964, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89; N.A.A.C.P. v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; Thomas v. Collins, 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, 431. We conclude that this statute must be reconciled with the first amendment if it is to be considered constitutional.

### B. *Section 1714 as Considered against the First Amendment*

■ (1) *The Problems of Vagueness and Overbreadth.* A criminal statute affecting expression protected by the first amendment must meet two stringent requirements. The first of these is the test of specificity: The statute will be held void for vagueness unless it defines the area of illegal conduct with sufficient specificity so that "men of common intelligence [need not] guess at its meaning." Connally v. General Constr. Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322. This requirement, in fact, is imposed upon all criminal statutes, but it is especially crucial in the first amendment area. *See* Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098; Kingsley Int'l Pictures Corp. v. Regents of New York, 1959, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512. Thus in ordinary criminal matters Government may balance its police power interests against the individual's right to notice of illegality and definition of the crime, but such balancing is looked upon with far less favor when it affects speech. *Compare* Nash v. United States, 1932, 229 U.S. 373, 33 S.Ct. 780, 572 L.Ed. 1232 (Sherman Act prohibitions on "restraint of trade" held sufficiently specific for criminal convictions) (Holmes, J.) *with* Winters v. New York, 1949,

333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (statutory ban on publications "so massed as to incite to violent and depraved crimes" held void for vagueness); *see also* Joseph Burstyn, Inc. v. Wilson, *supra* (term "sacrilegious" as a standard for moving picture censorship held void for vagueness). The strictness of these decisions has been explained thus by the Supreme Court:

> [S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser.

Smith v. California, 1959, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205. There is another reason for holding vague statutes void, and that is that they furnish insufficient checks on Government discretion. Cantwell v. Connecticut, 1940, 310 U.S. 269, 60 S.Ct. 900, 84 L.Ed. 1213; Herndon v. Lowry, 1936, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; see Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960).

■ We find that § 1714 is vague in its language "designed to solicit business in connection with the procurement thereof." "Solicitation" is nowhere further defined; and as we have pointed out § 1714 defines all information about foreign divorces designed to solicit business in procuring a divorce as non-mailable matter, without limitation as to whether the addressee has requested the information, regardless of its truth or falsity, and regardless of the relationship between the parties. In the case at bar, in fact, the information was sent in response to inquiries. We can easily see, if the statute can apply to the case at bar (and from the wording of the statute we cannot say that it does not), that an attorney writing to a client of long standing to discuss a question regarding a foreign divorce, even one that the parties had already contemplated in a face-to-face meeting, could

realistically be uncertain whether he was violating the statute. The trial court was concerned that such businesses as airlines and hotels might unwittingly violate § 1714 by advertising or service to customers. These may be reasonable interpretations of the statute as it is written. The House report that accompanied the bill, for example, quoted a letter that stated as follows:

> The enactment of the proposed measure is urgently recommended as it would clear the mails of advertisements, letters, circulars, and other written and printed matter containing misrepresentations not only of fact but also of law, encouraging the obtaining of invalid divorces, and would tend to put an end to these corrupt practices which are contrary to good morals and the general welfare of society.

H.R.Rep. No. 1370, 76th Cong., 1st Sess. (1939). Likewise, the Senate report attributes to the Act a sweeping, indefinite reach:

> The bill designates as nonmailable all written or printed matter sent through the mails for the purpose of inducing any person to resort to the courts of a foreign country to obtain a divorce, and makes it an offense for anyone to use the mails for the transmission of such nonmailable data.

S.Rep. No. 683, 76th Cong., 1st Sess. (1929). In short, because the meaning of "solicitation" is not clear, anyone who sends foreign divorce information through the mails to another with whom he has a business relationship cannot be certain whether his conduct is legal or not. As a statute affecting speech, § 1714 fails to measure up to a strict standard of specificity.

A second test of a statute regulating speech is that it may not encroach unduly upon protected first amendment interests. This doctrine of overbreadth is closely related to the vagueness doctrine, because indefinite laws tend to be overly broad as well, in that they not only provide insufficient notice of illegality but sometimes include within their prohibitions expression that is protected speech. The legislature cannot constitutionally use a "blunder-buss" approach that sweeps in wide areas of protected speech even if its goal is to eradicate an evil undeniably caused by a smaller included area of unprotected expression; it cannot simply decide that "a certain kind of speech [is], itself, harmful and unlawful." Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (clear and present danger test); *overruling* Gitlow v. New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 ("bad tendency" test). § 1714 is aimed primarily at fraud, an evil which the legislature unquestionably should be concerned with eliminating. But we find that § 1714, in its blanket prohibition of divorce information mailed in connection with solicitation of business, is not only vague in failing to give notice of illegality or define the crime but sweeps too broadly in that it would interfere not only with fraud but with lawyers attempting to advise clients of their legal rights. *Cf.* Brotherhood of Railroad Trainmen v. Virginia, *supra;* N.A.A.C.P. v. Button, *supra.* Furthermore, inasmuch as the statute might apply to mail that the addressee has requested (or might want, even if he has not requested it), it encroaches on the addressee's right to receive information, under Lamont v. Postmaster General, *supra.*

■ (2) *Balancing the Encroachment on Speech against the Public Interest.* Even though we have found some encroachment on speech through both vagueness and overbreadth, our inquiry is not completed. The freedom of speech is not absolute; it is subject to reasonable regulation both for its own preservation and for the furtherance of other overwhelming public interests. Red Lion Broadcasting Co. v. FCC, 1969, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371; Kovacs v. Cooper, 1949, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513; *cf.* Tinker v. Des Moines Independent Community School Dist., 1969, 393 U.S. 503, 89 S.Ct.

733, 21 L.Ed.2d 731. It seems clear that although "pure" speech is to be accorded comprehensive, perhaps even absolute, protection limited only by the clear and present danger test, *see* Schenck v. United States, 1919, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470, the protection accorded speech is not so great when it is coupled with "conduct." *Compare* Cox v. Louisiana, 1965, 379 U.S. 536, 85 S.Ct. 435, 13 L.Ed.2d 471, *with* Adderly v. Florida, 1966, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149. While recognizing that the "pure-nonpure" dichotomy requires one of the most difficult distinctions that interpretation of the first amendment presents, we find that in the case of "nonpure" speech we are required to balance the harm done by the overbreadth and vagueness of the statute against the legitimate interests the legislature was seeking to protect, to see whether those interests are so overwhelming as to justify the encroachment. American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925; *cf.* Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 912–914 (1963). Thus in one recent "speech-plus" case, Street v. New York, 1969, 394 U.S. 576, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572, the Supreme Court employed the following analysis:

> In these circumstances, we can think of four governmental interests which might conceivably have been furthered by punishing appellant for his words: (1) An interest in deterring appellant from vocally inciting others to commit unlawful acts; (2) an interest in preventing appellant from uttering words so inflammatory that they would provoke others to retaliate physically against him, thereby causing a breach of the peace; (3) an interest in protecting the sensibilities of passers-by who might be shocked by appellant's words about the American flag; and (4) an interest in assuring that appellant, regardless of the impact of his words upon others, showed proper respect for our national emblem.
>
> In the circumstances of this case, we do not believe that any of these interests may constitutionally justify appellant's conviction under § 1425 (16) (d) for speaking as he did.

Following the results of its balancing, the Court reversed a conviction for public desecration of the American flag. Similar reasoning was used in Tinker v. Des Moines Independent School Dist., *supra.* Other cases show that when speech is coupled with solicitation, as it is in the expression § 1714 prohibits, it is no longer pure speech and it is to be tested by the balancing approach. Brotherhood of Railroad Trainmen v. Virginia, *supra; cf.* Valentine v. Chrestensen, 1942, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262; Note, Freedom of Expression in a Commercial Context, 78 Harv.L.Rev. 1191, 1194–1203 (1965); Comment, The Brotherhood Case, 51 Va.L.Rev. 1693, 1694–1697 (1967).

We must therefore apply the balancing test to this case. To begin with, appellee points out that the expression forbidden by this statute is commercially motivated and argues that this factor differentiates it from the solicitation upheld in the *Button* and *Brotherhood* cases; we agree, but find that in the balance there is nonetheless some protection afforded it by the first amendment. *See* Note, Freedom of Expression in a Commercial Context, *supra.* Appellee also argues that since divorce information does not rise to the same dignity as political expression that affects "governing" rights, it involves a lesser free speech interest. Again we agree, but we note that information on matters of social importance, especially those relating to the marriage relation and the exercise of rights arising from the relation, is also given extensive Constitutional protection. Griswold v. Connecticut, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. Thus these considerations weaken appellant's claim but do not defeat it.

As to the legislative purpose involved, appellee has of course stated a significant interest by showing the need to prevent fraud in the procurement of foreign divorces. We agree with the trial court that this is the dominant purpose of the statute. At trial, and at some points in its brief, appellee seems to argue that another public interest also underlies § 1714; that of discouraging divorces and preserving families, or at least that of arrogating to our domestic courts the right to decide when a divorce should be granted. We do not think that this purpose, although an important one, constitutes an interest involved in the case at hand. The trial court dealt effectively with the argument as follows:

MR. BOYD (counsel for appellee):

Well, the matter of divorce being a matter of such public interest, and public policy, to try to keep families together, that sort of thing, I don't think that the courts intended for [commercial interests] to go around advertising divorce so that they can profit from it, I think that is one of the evils, if you read the legislative history there, maybe you already have, I think that is what they are trying to prevent.

THE COURT:

What disturbs me is that you have a public policy recommending divorce, you have public policy that says people can get a divorce in every State of the Union.[1]

We also feel that an overwhelming Congressional purpose to curb foreign divorces (as distinguished from curbing fraud), if it existed, could be manifested by more effective regulations than a ban on mailing divorce information. Moreover, the purpose of regulating divorces themselves is mentioned only peripherally in both the House and Senate Reports that accompanied the bills that became § 1714. Finally, this prosecution, which is apparently the first under the statute since it was enacted in 1939, stresses heavily the fact that appellant's letters contained misstatements of the law. We conclude that the only overwhelming interest that § 1714 advances is the prevention of fraudulently obtained, invalid divorces.

We hold that this interest does not justify the vagueness and pervasiveness of § 1714. The statute is not "reasonably restricted to the evil with which it is said to deal." *Cf.* Butler v. Michigan, 1957, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed. 2d 412. We confine our holding to the single question before us: The constitutionality of a statute prohibiting the mailing of divorce information that is "designed to solicit" business in procuring divorces. We have no doubt that a specific, narrow statute aimed at preventing fraud would be constitutional. Indeed, it might conceivably be constitutional even though written so as to encroach in some small measure on free speech interests, if the encroachment proved absolutely necessary to achieve the result. The possibility of fraud in the procurement of divorces, however, does not justify a statute that makes all mailing of foreign divorce information for business purposes a potential crime.

Reversed.

1. The district court, in fact, itself expressed serious doubts as to the Constitutionality of the statute.