Hollington, Appellee, *v.* Ricco et al., Appellants.

[Cite as Hollington v. Ricco (1973), 40 Ohio App. 2d 57.]

(Nos. 31908 and 31933—Decided December 14, 1973.)

*Mr. Everett Chandler*, for appellee.

*Messrs. Berkman, Gordon, Kancelbaum & Schwartz*, for appellants.

JACKSON, J. This appeal presents highly important questions involving efforts by law enforcement officials of the city of Cleveland to halt the flow of obscene literature within its boundaries. Through seven assignments of error, appellants assail practically every facet of these efforts, including the enabling legislation, the procedural steps taken to secure the restraints, and finally the restraints themselves.

On March 27, 1972, a Cleveland city prosecutor and several police officers entered the bookstore of the appellant Joseph Ricco, on orders of the chief police prosecutor to search for and confiscate obscene books and magazines. After identifying themselves they began to "thumb through the magazines trying to determine what they thought could possibly be pornographic," and upon concluding their examination seized 59 magazines and paperback books, all of different titles. Relevant to the validity of the seizure, it is noteworthy that the police were not acting pursuant to any search or arrest warrant, nor was the seizure incident to any arrest, nor did the police purchase any of the publications, and finally there is no evidence that the appellant Ricco explicitly consented to the seizure. The record is also silent as to what percentage of

appellant's entire inventory the 59 publications represented, although it appears that they did not confiscate all the items on display. Thus, it is impossible to determine whether the seizure can be considered "massive."

Three days later, on March 30, 1972, the Cleveland Law Director filed this action under the provisions of R. C. 2905.37, praying that the defendant be permanently enjoined from selling or displaying the 59 books and magazines seized by the police. Accompanying the complaint was a motion for a temporary restraining order. A hearing on the motion was scheduled for April 6, 1972, and, although the record does not indicate that notice of this hearing was actually served upon the appellant, his counsel did enter an appearance.

The hearing was brief and perfunctory. Police prosecutor Chandler was called to testify as to the circumstances surrounding the search and seizure. On this foundation, the city then introduced over defense objection six of the publications. The remaining 53 items were not offered apparently because they were regarded as being substantially the same as those introduced. Except for the six books and magazines, no other evidence was offered to establish their allegedly obscene character. At the conclusion of the hearing, the trial court ruled from the bench "that on the basis of the [six] exhibits * * * there is probable cause on the part of the complaining party to believe that a violation of Revised Code 2905.34 and 2905.35 has occurred," and that "under the General Equity Principles * * * [i]rreparable harm occurred to the community * * * ." Accordingly, the temporary restraining order was granted, to be effective for five days. This order broadly restrained the distribution of not only the 59 publications seized on March 27, 1972, but also "any other publications of films, books, magazines, pictures or devices which display or depict the acts set forth in Revised Code 2905.34, 2905.35 * * *."

On April 10, 1972, counsel for the appellant and the city prosecutor both appeared in court for a trial on the permanent injunction. The only evidence introduced at this hearing was the remaining 53 publications not previously offered, together with a stipulation incorporating the testi-

mony and exhibits introduced at the prior hearing on the temporary order.

Within the statutory prescribed period of five days, the trial court issued a permanent injunction of broader scope than the restraining order. It enjoined the sale and distribution of the seized publications as well as "any material which constitutes obscenity in that the following three elements exist and coalesce:

"(1) The dominant theme of the material taken as a whole appeals to a prurient interest in sex;

"(2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and

"(3) The material is utterly without *redeeming* social value.

"(4) Material appeals to a prurient interest in sex when it has a tendency to excite lustful thoughts or appeals to a shameful or morbid interest in nudity or sex. 'Appeal to prurient interest in sex' is not limited to material which causes lustful acts (rather than only thoughts) or which causes action reprehensible to society. An appeal to voyeurism constitutes an appeal to a prurient interest in sex.

"(5) Material affronts contemporary community standards relating to the description or representation of sexual matters where the material affronts the standards of the average person of the national community. Neither the standards of the most permissive or liberal localities or segments of society, nor the standards of the most restrictive or conservative localities or segments of society constitute the national community standard. It is the standard of the national community, rather than the community itself that must be affronted, and such standard may be affronted even in the absence of evidence that any member of the community was or could have been personally affronted.

"(6) 'Social value' resulting from the fact that material is obscene does not constitute redeeming social value. Redeeming social value is 'social value' existing for some use or purpose other than obscenity but such social value may be present in material despite the fact that it contains all the attributes of obscenity.

"(7) Where material is offered for sale because it constitutes obscenity and for use as erotica through an appeal to the erotic interest of the purchaser, the existence of redeeming social value with respect to the use of the material for some other purpose (in a different context) is not available as a defense to such seller (or panderer).

"(8) Pandering of obscenity is the business of purveying pictorial or graphic matter openly advertised to appeal to the erotic interest of customers or potential customers by either blatant and explicit advertising or subtle and sophisticated advertising.

"(9) 'Medium core pornography' as well as 'hard core pornography' constitutes obscenity that is not within the area of constitutionally protected speech or press."

The court cited two statutory schemes as the basis for this decree. In addition to Chapter 2905, Revised Code, the court relied upon Chapter 3767, Revised Code, to hold that the bookstore of Ricco's constituted a nuisance.[1] We cannot avoid commenting on the unusualness of this finding, since at no point during the proceedings did the prosecutor ground his claim on a nuisance theory nor did he make any effort to comply with the provisions outlined in Chapter 3767, Revised Code.

However, this did not represent the only bizarre aspect of this case. On the same day that the court entered this order against the appellant Ricco, the prosecutor took the unusual step of filing an amended complaint for the purpose of joining seven additional bookstore proprietors as co-defendants. Like the original complaint, the amended pleading included a request for a temporary restraining order, and on April 17, 1972, the court conducted a hearing on the interlocutory order. Officers Vrana and Pope testified that they visited the bookstores of the seven new defendants on April 10 and 11, 1972, in much the same manner as before, and seized a total of 23 magazines. As before, the police neither acted on the authority of any warrant nor did they arrest any of the clerks and seize the

---

[1]These nuisance statutes have recently been upheld as a proper weapon for curbing obscenity. *State, ex rel. Keating*, v. *Vixen* (1973), 35 Ohio St. 2d 215.

publications incident thereto, nor did they purchase them.

The Law Director of Cleveland filed this action under R. C. 2905.37, which empowers the Common Pleas Court to enjoin the sale and distribution of obscene material "[w]here it appears that section 2903.14 [not pertinent to the instant appeal] or 2905.35 is being or is about to be violated.'"[2] R. C. 2905.35 declares the sale and distribution of obscene material, as well as other related acts to be criminal offenses.[3] Both Sections 2905.35 and 2905.37 are not self-containing but are dependent upon R. C. 2905.34 (A), which delineates the standards for determining whether material is obscene.[4] This latter statute was last amended in 1970 and represents an effort by the General Assem-

---

[2]"§2905.37 [Enjoining sale or distribution of obscene material.]

"(A) Where it appears that section 2903.14 or 2905.35 of the Revised Code is being or is about to be violated, the county prosecutor or chief executive or legal officer of a municipal corporation in the jurisdiction where such violation is taking place or is about to take place, may maintain an action in the common pleas court to enjoin the sale, distribution, or presentation of the obscene material or performance, or enjoin the sale, distribution, or presentation to minors under eighteen of the material or performance harmful to minors."

[3]"§2905.35 [Production or dissemination of obscene material or performances.]

"No person, with knowledge of the content and character of the obscene material or performance involved, shall make, manufacture, write, draw, print, reproduce, or publish any obscene material, knowing or having reasonable cause to know that such material will be sold, distributed, circulated, or disseminated; or sell, lend, give away, distribute, circulate, disseminate, exhibit, or advertise any obscene material; or write, direct, produce, present, advertise, or participate in an obscene performance; or possess or have in his control any obscene material with intent to violate this section; or offer or agree to do any act in violation of this section, or cause any such act to be done by another.

"Whoever violates this section shall be fined not more than five thousand dollars or imprisoned not more than one year, or both, for a first offense, and for each subsequent offense shall be fined not more than ten thousand dollars or imprisoned not less than one nor more than seven years, or both."

[4]§2905.34:

"As used in sections 2903.13 to 2903.16, inclusive, and sections 2905.39, inclusive, of the Revised Code:

"(A) Any material or performance is 'obscene' if, when considered

bly to formulate a detailed yet all encompassing definition of obscenity. The Ohio Supreme Court has recently held that at least parts of Sections 2905.34 and 2905.35 comport with constitutional standards announced by the Supreme Court of the United States in *Miller* v. *California.*[6]

By their first assignment of error, appellants urge that

as a whole and judged with reference to ordinary adults, any of the following apply:

"(1) Its dominant appeal is to prurient interest;

"(2) Its dominant tendency is to arouse lust by displaying or depicting nudity, sexual excitement, or sexual conduct in a way which tends to represent human beings as mere objects of sexual appetite;

"(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) It contains a series of displays or descriptions of nudity, sexual excitement, sexual conduct, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient interest, when the appeal to such interest is primarily for its own sake or for commercial exploitation, rather than for a genuine scientific, educational, sociological, moral, or artistic purpose.

"(B) 'Nudity' means the showing, representation, or depiction of human male or female genitals, pubic area, or buttocks with less than a full, opaque covering, or of a female breast with less than a full, opaque covering or any portion thereof below the top of the nipple, or of covered male genitals in a discernibly turgid state.

"(C) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

"(D) 'Sexual conduct' means masturbation, homosexuality, lesbianism, sadism, masochism, natural or unnatural sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, a breast.

"(E) 'Material' means any book, pamphlet, ballad, printed paper, phonographic record or tape, motion picture film, print, picture, figure, image, description, or other tangible thing capable of being used to arouse interest through sight, sound, or in any other manner.

"(F) 'Performance' means any motion picture, preview, play, show, skit, dance, or other exhibition performed before an audience."

[6]41 U. S. L. W. 4925 (U. S. June 21, 1973). In *State, ex rel. Keating,* v. *Vixen* (1973), 35 Ohio St. 2d 215, the Ohio Supreme Court, in a *Per Curiam* opinion, held that ". . . the statutes applied in this cause . . . comport with the standards enunciated in *Miller.*" The statutes so applied were parts of both Sections 2905.34(A)(4) and 2905.35. The companion *Per Curiam* decision, *State, ex rel. Sensenbrenner,* v. *Book Store* (1973), 35 Ohio St. 2d 220, interprets *Vixen* to hold flatly that Sections 2905.34 and 2905.35 comport with the *Miller* standards.

this court assume the burden of judicial review and strike down R. C. 2905.34 as being void for vagueness and overbreadth. This argument does not question the power of the legislature to control, by appropriate statutory enactment, the distribution of obscene materials within the state. Rather, it is built on the premise that in this most sensitive area of First Amendment rights, where protected speech must be delicately and carefully separated from illegitimate expression, that power must be exercised with precision. *Shelton* v. *Tucker* (1960), 364 U. S. 479, 488.

The vagueness argument has its roots in the Fifth and Fourteenth Amendments Due Process clauses. As the court stated in *Giaccio* v. *Pennsylvania* (1966), 382 U. S. 309, 402-03, ''a law fails to meet the requirements of the Due Process clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.'' The overbreadth argument, on the other hand, is premised on the First Amendment and reflects the constitutional principle that ''a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.''[6] Although the two doctrines are conceptually distinct, their paths often cross. As the court noted in *Hiett* v. *United States* (5th Cir. 1969), 415 F. 2d 664, 671, the ''doctrine of overbreadth is closely related to the vagueness doctrine, because it tends to be overly broad as well, in that they not only provide insufficient notice of illegality but sometimes include within their prohibitions expression that is protected speech.''

In asserting that the Ohio statutory scheme must succumb to the doctrines of overbreadth and vagueness, appellants focus narrowly on subsection (A) of R. C. 2905.-34, the definitional statute.[7] Appellants maintain that this subsection is vague and gives the accompanying penal and

---

[6]*NAACP* v. *Alabama* (1964), 377 U. S. 288, 307.

[7]See note 4, *supra.*

injunctive statutes too broad a reach because it lacks the second and third elements of the tripartite test of *Memoirs v. Massachusetts*:[8] '' (a) the dominant theme of the material taken as a whole appeals to the prurient interest in sex; (b) the material is patently offensive because it offends contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.''

This federally mandated definition was recently supplanted by *Miller* v. *California*,[9] which announced new guidelines for defining the limits of the state's power to curb obscene expression. The majority of the Supreme Court approved the following three-pronged formula: material is obscene if (1) taken as a whole, it appeals to the prurient interest in sex; (2) it portrays sexual conduct in a patently offensive way; and (3) taken as a whole, it does not have serious literary, artistic, political, or scientific value.[10] Because the instant appeal in one respect involves the continued validity of the injunction issued by the trial court below, we believe that the Ohio statute must be examined under the recent *Miller* decision.

The first element of the *Miller* test is obviously met in R. C. 2905.34(A)(1).

Appellants might argue that the second element in the *Miller* test is missing from R. C. 2905.34(A) because this section does not contain the words "patently offensive." However, we conclude that any fair interpretation of this statute would find that the second element of the *Miller* test is present. Subsection (A) of R. C. 2905.34 could not under *Memoirs,* nor can it now under *Miller* be construed as producing a complete and exclusive listing of conduct and materials defined as obscene. Therefore, in defining "obscenity" the Ohio legislature must necessarily use some general descriptive phrases. The fact that the descriptive phrase "patently offensive" is not found in R. C. 2905.34 (A) does not necessarily imply that the legislature intend-

---

[8](1966), 383 U. S. 413, 418.
[9]41 U. S. L. W. 4925 (U. S. June 21, 1973).
[10]*Id.* at 4927.

ed to eliminate this element and thereby unduly expand the reach of the statute. In place of the words "patently offensive" the state legislature has used descriptive phrases found in subsections (2) and (3) of R. C. 2905.34(A). These phrases are "depicting * * * sexual conduct in a way which tends to represent human beings as mere objects of sexual appetite," and "* * * dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality." These phrases contain substantially the same idea as the phrase "patently offensive." In fact, if the Ohio statute deviates at all from the standard "patently offensive," it does so by using phrases which are more narrow and explicit.

The third element of the *Miller* test is met in subsection (4) of R. C. 2905.34(A).

On the basis of this interpretation we must reject appellants' arguments that R. C. 2905.34 is unconstitutional because of vagueness or overbreadth.

## II.

The second assignment of error challenges the propriety of issuing temporary restraining orders to enjoin the distribution and sale of publications prior to a final hearing on their alleged obscenity. Appellants argue that this type of provisional relief is not specifically authorized by R. C. 2905.37 and therefore should not have been granted on behalf of the City. Before considering this question it is first necessary to dispose of appellee's argument that this issue is now moot.

The concept of mootness as a limitation upon appellate review has traditionally been invoked in those cases where events occurring during the pendency of the appeal so alter the posture of the controversy as to make further judicial response ineffective and inconsequential. For example, in *Sakacsi* v. *McGettrick* (1967), 9 Ohio St. 2d 156, cited by appellee, the Ohio Supreme Court invoked this doctrine to avoid reviewing the granting of a writ of habeas corpus where the agency detaining the petitioner had transferred legal custody pending appeal to another governmental unit. The City of Cleveland attempts to analo-

gize the instant case with *Sakacsi* by arguing that this court's granting of a stay, pending appeal, of the permanent injunctions into which the temporary restraining orders were merged, rendered the controversy over the interlocutory orders moot. However, the granting of the stay itself in no respect extinguished the fires of controversy between the parties, and has not reduced the decision which we announce today to a mere advisory opinion. Moreover, we do not believe that the doctrine of mootness can be expanded to eclipse the general rule allowing for the review[11] of interlocutory orders in an appeal from a final judgment. It has been stated that "under modern statutes and modern rules, an appeal from a final judgment brings up for review all interlocutory or intermediate orders involving the merits and necessarily affecting the final judgment which were made prior to its entry." *Robinson* v. *Meding* (1960), 52 Del. 578, 163 A. 2d 272, 275. See generally 5 Am. Jur. 2d, Appeal & Error, §856, at 298 (1962).

In turning to the merits of this assigned error, the first point of inquiry must be the statute authorizing injunctive relief against the sale and distribution of obscene material, R. C. 2905.37. Appellant asserts that the failure to specifically authorize temporary restraining orders indicates a legislative intent to withhold such relief in these proceedings. We find that this interpretation of the statute is persuasive. The predecessor of R. C. 2905.37, enacted in 1959, provided for the issuance of temporary restraining orders against the sale and distribution of material, pending a trial of the issues. 128 Ohio Laws 359 (1959), codified as R. C. 2905.343. But within the year the Common Pleas Court for Mahoning County held this provision unconstitutional to the extent that it allowed for ex parte orders before service of summons. *State, ex rel. Beil,* v. *Mahoning*

---

[11]The concept of reviewability is to be distinguished from the concept of appealability, which focuses on the ripeness of finality of an order or judgment. See 4 Am. Jur. 2d, Appeal & Error §47, at 570 (1962). Thus, while an interlocutory order is normally said to be non-appealable in the sense that it is not final, it does not follow that it is non-reviewable once an appeal is properly filed.

*Valley Distrib. Agency, Inc.* (1960), 84 Ohio Law Abs. 427, *Aff'd on other grounds* (1962), 116 Ohio App. 57. When the 1959 statute was repealed and superceded by R. C. 2905.37, the provision pertaining to restraining orders was noticeably excluded. We infer from this legislative fact that the General Assembly perceived the potential constitutional infirmatives created by the prior restraints inherent in a temporary restraining order and sought to avoid them by withholding this form of relief.

It may also be suggested that these ex parte restraints on sale and distribution cannot really be supported on those grounds which have historically justified the issuance of temporary restraining orders. The temporary restraining order originally was developed to overcome the inherent slowness of the judicial process in hearing evidence and deciding the issues in an adversary context. Without some device for maintaining the status quo, irreparable harm can occur before a final resolution of the legal issues. Even assuming generally that the exploitation of obscene material has harmful and antisocial effects and that it debases and distorts "a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality,"[12] it is extremely doubtful whether the interim sales would so irreparably harm the public as to warrant the drastic step of enjoining sale and distribution prior to an adversary hearing. At least in the sparse record before us the prosecutor certainly did not assert nor did he demonstrate any urgency justifying ex parte relief. Moreover, the need for these temporary restraints is further diminished because of the time limitations mandated in R. C. 2905.37, to-wit: no more than ten (10) days may elapse between the filing of the complaint and the announcement of decision.

### III.

Appellants attack the permanent injunctions as being overly broad in several respects. We agree. First, the court

---

[12]*Paris Adult Theatre I* v. *Slaton*, 41 U. S. L. W. 4935, 4939 (U. S. June 21, 1973).

violated fundamental principles of procedural due process by enjoining, pursuant to R. C. 3767.02, the appellants from maintaining a "nuisance" at their respective book stores. This case was never prosecuted nor defended on the nuisance theory, and thus this facet of the injunction was tantamount to depriving the appellants of their livelihood without adequate notice or opportunity to be heard.[13] Second, the court's attempt to extend the scope of the injunction to include "medium core" pornography must fail because of vagueness. Finally, the court's effort to catapult the injunction to a restraint on any materials in the defendants' bookstores that may fall within the court's definition of obscenity is clearly impermissible. The power of the Common Pleas Court under 2905.37 is limited to enjoining the sale and distribution of just that material which is lawfully presented to the court and which is determined to be obscene. Thus, the injunction must be set aside to the extent that it enjoins materials not determined by the court to be obscene.

## IV.

The seized publications were the sole incriminating evidence of their alleged obscenity. The city offered no supporting evidence to establish that the books and magazines appealed to the prurient interest, were patently offensive to contemporary community standards, or were utterly without redeeming social value.[14] The fourth assignment of error raises the question of whether, as a general evidentiary principle, the books and magazines, by themselves, can be sufficient proof of their obscenity.

In *Paris Adult Theatre I* v. *Slaton*, an obscene film case, the Supreme Court observed that the "films, obviously, are the best evidence of what they represent," and, consequently, the court held that the prosecutor was not necessarily required to introduce additional expert evidence

---

[13]*State, ex rel. Chalfin*, v. *Glick* (1961), 172 Ohio St. 249, 252; *Commonwealth* v. *Boley* (1971), 441 Pa. 495, 272 A. 2d 905, 908.

[14]The "utterly without redeeming social value" test had not been rejected by the Supreme Court at this time.

that the materials were obscene.[15] Although a distinction can be drawn between a film and a book or magazine, it is mainly one of form, rather than substance. Both are mediums for conveying mental impressions and for stimulating thought. In terms of the fact finder's ability to comprehend the nature and context of these impressions and to evaluate their effect upon the human intellect, we perceive no essential difference between the two mediums. If a court or a jury needs no assistance from an expert witness in determining whether a film is obscene, it likewise will require no such assistance in evaluating material in print.

Further, the *Miller* decision recognized that precisely what is "patently offensive" or appeals to the "prurient interest" is basically a question of fact, and that our adversary system has traditionally permitted lay jurors drawing on their community standards, and guided by instructions on the law, to make the ultimate findings of fact.[16] Thus, based upon the *Paris* and *Miller* decisions, we cannot hold that a prosecutor must produce expert witnesses to establish the obscenity of seized materials.[17]

## V.

The fifth assignment of error claims that there was a misjoinder of the parties. Joseph Ricco was originally the sole defendant in this case. It was only *after* the trial court issued its permanaent injunction against him that the prosecutor sought to include seven new party defendants. Appellants maintain that the only reasons for this joinder

[15] 41 U. S. L. W. 4935 (U. S. June 21, 1973). *See, also, Kaplan* v. *California* (1973), 37 L. Ed. 2d 492; and *State* v. *Valchar* (Cuyahoga Co., 1973), 34 Ohio App. 2d 21, 25, in which this court held that with respect to material which was "hard core pornography," no expert testimony was needed to aid the trier of the facts in determining whether the material met the three-fold *Roth* test of obscenity.

[16] 41 U. S. L. W. 4925, 4929 (U. S. June 21, 1973).

[17] The only reservation we place upon this holding is the one noted by the Supreme Court in *Paris Adult Theatre*: there may be the "extreme case * * * where contested materials are directed at such bizarre deviant group that the experience of the trier-of-fact would be plainly inadequate to judge whether the material appeals to the prurient interest." 41 U. S. L. W. at 4937 n. 6. The material in the case at bar does not present such an "extreme case."

was "to keep the same case number and *assure the same judge*, a result otherwise impossible to guarantee under the prevailing personal docket system in the common pleas court." The record does not disclose the prosecutor's motives in taking this unusual step, but regardless, we hold that it was error for the court to comply.

As a civil action, a proceeding under R. C. 2905.37 is governed by the Rules of Civil Procedure, except where otherwise provided in the statutory scheme, Civ. R. 1(A). Civil Rule 20 controls the joinder of parties and provides in part:

"All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the *same transaction, occurrence or succession or series of transactions or occurrences* and if any question of law or fact common to all defendants will arise in the action." (Emphasis added.)

Even assuming that joinder is otherwise available once the court has entered a final judgment against the first party defendant, there is not the slightest shred of evidence indicating that the defendants shared in a common transaction or occurrence. As far as we can perceive, the defendants were eight different, independent bookstores, which shared the distinction of selling allegedly obscene publications. This common denominator does not furnish a sufficient nexus to warrant a joint trial of the defendants. The prosecutor chose to rest his case on the seized magazines and books themselves, without extended evidence relating to the elements of obscenity. And, save for a film which the court refused to admit, the appellants presented no evidence in defense. Thus, there was not the confusion and delay which can attend the complex amalgamation of unrelated facts and issues in a multifarious suit.[18]

## VI.

The sixth assignment of error presents the question of whether the trial court's finding that the seized mater-

---

[18]*See Henderson* v. *Ryan* (1968), 13 Ohio St. 2d 31, 38, which notes the point at which joinder becomes prejudicial.

ials are obscene, and therefore not protected by the First and Fourteenth Amendments, is supported by the evidence. Having determined that the books and magazines may be the sole evidence of their obscenity (see Part IV), it becomes the responsibility of this court as an appellate tribunal to review the material independently of the trial court's findings. Since obscenity cases in general must be decided on their own individual facts, and therefore, are of little precedential value, we find it unnecessary to launch into a graphic description of the evidence. Suffice to say that after a thorough review and examination of each of the books and magazines, we find that the trial court's judgment is supported by the evidence.

## VII.

Appellants finally challenge the method by which the police took possession of the publications. As noted above, the books and magazines were seized (not purchased) on the basis of an on-the-scene evaluation by the police, without the benefit of an impartial review by a judicial magistrate. Relying on the teaching of *Marcus* v. *Search Warrant* (1961), 367 U. S. 717, and *A Quantity of Copies of Books* v. *Kansas* (1964), 378 U. S. 205, appellants argue that this procedure was too insensitive to "focus searchingly on the question of obscenity," and was therefore constitutionally defective. They contend that an adversary hearing should have preceded the seizure as the first step in these injunctive proceedings. This argument was rejected in substance by the Ohio Supreme Court in *State* v. *Albini*[19] where the court held that a prior adversary hearing was not constitutionally required when police seized a single copy of a film incident to a warrantless arrest for violation of the obscenity laws. Subsequently, *State* v. *Blair*[20] extended this principle to the seizure of books and magazines. However, these decisions no longer have the authority of binding precedent, because they were recently vacated by the United States Supreme Court and remanded for reconsideration in the wake of the Court's new obscenity

[19] (1972), 31 Ohio St. 2d 27.
[20] (1972), 32 Ohio St. 2d 237.

rulings.[21] Two of these rulings bear directly upon the constitutional need for warrants and adversary hearings prior to the seizure of allegedly obscene material.

A. *The Need for a Warrant*

In *Roaden* v. *Kentucky*[22] a sheriff viewed a sexually explicit film at a local theater. He then seized the film and arrested the theater manager for violating the state's obscenity statute. Because the seizure and the arrest were accomplished without the authority of a warrant, the theater manager moved to have the film suppressed as evidence at the trial. The court overruled the motion and, upon appeal of Roaden's conviction to the state's high court, this ruling was upheld on the ground that the seizure was incident to a lawful arrest.[23] Upon further appeal to the United States Supreme Court, the defendant's contention that the warrantless seizure was unreasonable under the Fourth and Fourteenth Amendments was finally sustained. The Supreme Court held that such seizure, in the absence of a warrant describing with particularity the "things to be seized," was a form of prior restraint upon the right of expression. Further, the court noted that this case, involving a film regularly scheduled for exhibition at a commercial theater, presented no exigent circumstances, such as the risk of the film's destruction, which might otherwise justify a warrantless seizure.

With respect to warrant requirements of the Fourth Amendment, it must be remembered that the right guaranteed by this Amendment is a personal one, enjoyed by each citizen. As has been repeatedly stated, the Fourth Amendment's historic purpose is to protect the personal security of the individual in his home and in his place of business

---

[21] *Albini* v. *Ohio*, 41 U. S. L. W. 3667 (U. S. June 25, 1973); *Blair* v. *Ohio*, 41 U. S. L. W. 3671 (U. S. June 25, 1973).

[22] 41 U. S. L. W. 5070 (U. S. June 26, 1973).

[23] A warrantless search incident to a valid arrest has been one of the long recognized exceptions to the warrant requirements of the Fourth Amendment and has been upheld as reasonable on the grounds that it serves "the legitimate needs of law enforcement officers to protect their own well being and preserve evidence from destruction." *United States* v. *United States District Court* (1972), 407 U. S. 297; *Chimel* v. *California* (1969), 395 U. S. 752, 762-64.

from unwarranted and arbitrary government intrusion.[24] It should make little difference, therefore, whether a bookstore proprietor is subjected to a "massive" seizure of his stock in trade or simply one of quantitatively smaller proportions, designed to secure sample copies for future prosecution. In either case, there is governmental intrusion, and the personal security of the individual is disturbed. In either case, Fourth Amendment rights of the individual are threatened.

We hold then that the Fourth Amendment requires that law enforcement officials must secure a warrant even where their purpose is to gather sample copies of books and magazines for use as evidence in a subsequent prosecution.

It, of course, might be argued that *Roaden* might be distinguished on the grounds that there exists exigent circumstances in the case at bar, which the *Roaden* court found lacking in the case of regularly scheduled films. However, the burden of proving such circumstances has always been allocated to the party seeking the exemption from the warrant requirement.[25] This burden was not met by the appellee city in the instant case. Nowhere in the course of the proceedings does the record disclose that the appellee attempted to establish that the exigency of the moment required seizure of the materials by the police prior to securing a search warrant.

Further, while the record does disclose that in some of the bookstores an individual may have consented to the seizure of materials, there is no conclusive evidence that anyone *with authority* to do so voluntarily consented to any of the searches or seizures.[26]

Consequently, we must conclude that the warrantless searches and seizures conducted at the stores of the eight defendants were unreasonable and violative of the Fourth Amendment. The trial court erred, therefore in not grant-

---

[24]*Coolidge* v. *New Hampshire* (1971), 403 U. S. 443, 455; *Hoffa* v. *United States* (1961), 385 U. S. 293, 301.

[25]*See, e. g., Coolidge* v. *New Hampshire* (1971), 403 U. S. 443, 455.

[26]The person giving consent was variously referred to as, "the person in charge," "the proprietor," and "the individual in the place."

ing the motion to suppress the material which was the product of these illegal searches and seizures.[27]

B. *The Need for a Prior Adversary Hearing*

Another recent case, *Heller* v. *New York*[28] focuses on the need for an adversary hearing as a prerequisite to the issuance of a warrant. In *Heller,* the petitioner was arrested and convicted for exhibiting an obscene film. The film introduced at trial had been seized by police pursuant to a search warrant that had been issued ex parte by a magistrate who had personally seen the film. However, there was no adversary hearing, either before, or immediately after the seizure, to confirm the magistrate's finding of probable cause. It was only at the criminal trial itself, 47 days after the arrest and seizure, that the films received adversary scrutiny. Petitioner appealed his conviction to the Supreme Court, contending that the seizure was unconstitutional in the absence of a prior adversary hearing.

The Court rejected this argument on the basis of the following facts disclose by the record: First, the purpose of the seizure was to preserve a copy of the film as evidence, not to subject it to a "final restraint," in the sense of being enjoined from exhibition or threatened with destruction; second the State of New York stood ready to grant immediate adversary hearings on pretrial motions challenging the seizure; third, the petitioner failed to request a prompt adversary hearing after the judicially authorized seizure, nor did he attempt to show that the seizure of the copy prevented continued exhibition of the film. Against this factual background, the Court sanctioned a procedure which, it concluded afforded adequate protection to the First Amendment guarantees while avoiding the burden of a prior adversary hearing.[29]

---

[27]*See Bumper* v. *North Carolina* (1968), 391 U. S. 543; *People* v. *Horman* (1968), 29 App. Div. 2d 569, 589, N. Y. S. 2d 642, *aff'd* 22 N. Y. 2d 378, 239 N. E. 2d 625, which extend the exclusionary rule to proceedings which are arguably civil in nature.

[28]41 U. S. L. W. 5067 (U. S. June 25, 1973).

[29]"If * * * a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and following the seizure, a prompt judicial determination of the obscenity issue an adver-

Thus, with respect to the need for an adversary hearing prior to the seizure of any allegedly obscene material, no extended discussion is required to conclude that appellants' argument has been rejected in principal if specified safeguards are present as enunciated by *Heller* v. *New York, supra.* As the above summary indicates, where (1) the material is seized to preserve it as evidence and not for the purpose of imposing a final restraint, and (2) a prompt adversary hearing is available, First Amendment freedoms are sufficiently protected where the seizure is preceded by the determination of probable cause made by a neutral magistrate prior to the issuance of a search warrant.

Therefore, because the order of the trial court is based upon evidence which should have been suppressed, and because it contains a permanent injunction which is unlawfully broad, the order and decree issued on May 22, 1972, by the Court of Common Pleas is reversed and judgment granted for defendants appellants. Appellants are discharged.

*Judgment reversed.*

MANOS, C. J., and KRENZLER, J., concur.

---

sary proceeding is available at the request of any interested party, the seizure is constitutionally permissible. In addition, on a showing to the trial court that other copies of the film are not available to the exhibitor, the court should permit the seized film to be copied so that showing can be continued pending a judicial determination of the obscenity issue in an adversary hearing. Otherwise, the film must be returned." *Id.* at 5069-70.